**P.D.Q. INC. OF MIAMI, Plaintiff,**

v.

**NISSAN MOTOR CORPORATION IN U.S.A., Defendant.**

**Arthur SCHARF, on behalf of himself and all others similarly situated, Plaintiff,**

v.

**NISSAN MOTOR CORPORATION IN U.S.A., Defendant.**

**Nos. 72–1159–Civ.–C.A., 73–121–Civ.–C.A., M.D.L. No. 120.**

United States District Court, S. D. Florida.

Dec. 6, 1973.

Fredric B. Burns, of Sager & Burns, Miami, Fla., and Wolf, Block, Schoor & Solis-Cohen, Philadelphia, Pa., for plaintiff P.D.Q. Inc. of Miami.

Bobroff, Olonoff & Scharf, New York City, for plaintiff Arthur Scharf.

Morris F. Klein, of Blackwell, Walker, Gray & Powers, Miami, Fla., and Lillick, McHose, Wheat, Adams & Charles, Los Angeles, Cal., for Nissan Motor Corp.

## ORDER ON MOTION FOR CLASS ACTION

ATKINS, District Judge.

This consolidated proceeding is before the Court on the request filed by both plaintiffs that the action be allowed to proceed as a class action pursuant to Rule 23 of the F.R.Civ.P. The motion has been fully briefed and the Court has had the benefit of oral argument on the motion. For the reasons more fully set out below, the Court has decided to grant the motion in part.

### I

The two cases comprising this multidistrict litigation arise out of the Southern District of Florida and the Southern District of New York, and they were consolidated by the Judicial Panel on Multidistrict Litigation in this Court for the purpose of conducting pretrial proceedings. The complaints filed in both cases sought to have the Court designate the proceedings as class actions, and it is that request that must be dealt with now. The test to be employed by the Court is that test set forth in Rule 23 of the F.R.Civ.P.; that is, the Court must determine whether the prerequisites of subpart (a) have been met and additionally whether one of the three provisions of subpart (b) is applicable. The discussion as it relates to these requests is simplified due to the agreement by the parties that only subsection 3 of subpart (b) is applicable, making reference to subsections 1 and 2 unnecessary should the Court progress that far.

The complaints in both actions allege Sherman and Clayton Act violations by the defendant and its various dealers in that they have combined and conspired (1) to fix the retail prices for Datsun automobiles; (2) to refrain from selling through automobile brokers or discount houses; and (3) to allocate marketing territories for Datsun motor vehicles. These violations have allegedly occurred from a time prior to 1966 up to and including the date of filing of the complaints herein.

■ 23(a)(1): In plaintiff's motion and memorandum it is argued that the class should be comprised of "all Datsun purchasers in the United States, its territories and Puerto Rico." The defendant, in its response to the motion for class action determination "recognizes that the class asserted by plaintiffs, which purports to contain approximately 630,000 persons who have purchased Datsun vehicles since July 1, 1968, is too numerous to permit joinder of all class members." For this reason the Court will consider the first prerequisite to have been met.

■ 23(a)(2): The Rule next requires that there be questions of law or fact common to the class. Commenting on this, the plaintiffs point out that in their view the central issue of fact is whether or not there existed a nationwide conspiracy between Nissan and its franchised dealers. Citation to several relatively recent cases, such as In Re Ampicillin Antitrust Litigation, 55 F.

R.D. 269 (D.D.C.1972) and Philadelphia v. American Oil Co., 53 F.R.D. 45 (D.N. J.1971), buttresses their theory of the class. The defendant, on the other hand, vigorously disputes the "common nucleus" theory advanced by the plaintiffs. After consideration of the problem raised by the failure to join the more than 1000 past and present retail dealers, with the concomitant inability of the plaintiffs to demonstrate the localized effect of—and eventual damage caused by—the alleged conspiracy, Lah v. Shell Oil Co., 50 F.R.D. 198 (S.D. Ohio 1970), Nissan attempts to convince the Court that the establishment of the fact of damage will require detailed inquiry into each retail sale in each section of the country, in each of the time frames involved, in order to ascertain what the individual automobile's "but for" price would have been absent the conspiracy. Cotchett v. Avis Rent A Car System, Inc., 56 F.R.D. 549 (S.D.N. Y.1972).

While both positions have merit to them, for the purpose of deciding whether "there are questions of law of fact common to the class" the Court is inclined to adopt the plaintiffs' position. The key issue in litigation of this type is the existence of a conspiracy and its effect on interstate commerce. Tactical problems inherent in arriving at a satisfactory calculation of damages must be considered, and given their appropriate weight, elsewhere in Rule 23.

■ 23(a)(3): In this instance, are "the claims or defenses of the representative parties . . . typical of the claims and defenses of the class"? The plaintiffs allocate exactly one page of their memorandum to this question, and assert in a conclusory fashion that the plaintiffs' status as purchasers makes their interests identical with a class composed of all purchasers. Perhaps this is a judicious allocation of resources, however, in view of one commentator's observation that "[i]n fact, there is no need for this clause, since all meanings attributable to it duplicate requirements prescribed by other provisions in Rule 23." 3B Moore's Federal Practice ¶ 23.06–2 (2d ed. 1969), p. 23–325, quoted in Rosado v. Wyman, 322 F. Supp. 1173 (E.D.N.Y.1970), aff'd 437 F.2d 619 (2d Cir. 1971), aff'd 402 U.S. 991, 91 S.Ct. 2169, 29 L.Ed.2d 157. The confusion resulting from this apparent overlap might also explain the treatment by the defendant of this and the subsequent subsection together, with the end result being the contention that the same facts that make the plaintiffs unrepresentative also make them atypical.

This type of over-simplified treatment of Rule 23 is in error in this Court's opinion. *See* Vernon J. Rockler and Co. v. Graphic Enterprises, Inc., 52 F.R.D. 335, 343 (D.Minn.1971). *See also* Note, Class Action: Defining the Typical and Representative Plaintiff Under Subsections (a)(3) and (4) of Federal Rule 23, 53 B.U.L.Rev. 406 (1973).[1] At this stage of the Rule 23 analysis the Court is inquiring into the existence of any "claim or defense" possessed by the expectant class representative that is dissimilar from those "claims or defenses"

---

1. The introduction of this article warns the reader that

> . . . The particular concern will be whether the prerequisites (a)(3) and (4) of Rule 23, that the plaintiff's claim be typical and that he be capable of fairly and adequately representing his class, have been carefully and consistently applied.

Id. at 407. One does not have to read far into the note to decide that they have not been. The problems with (a)(3) to date seem to be: (1) the failure of the Court to take full cognizance of the potential *res ju-*

*dicata* effect of a mishandled class action; (2) the attempts to define "typical" that have resulted in a duplication of some other requirement; (3) manipulation of Rule 23 requirements to effectuate the implementation of other important statutory policies; (4) misplaced emphasis on size of class or identity of individuals comprising it, rather than an objective definition of the class; and (5) a divergence of view as to whether the plaintiff's interest must be coextensive with the class he seeks to define.

belonging to the other class members. In other words, in this type of situation the representative might be atypical if his purchase involved only one automobile while most other potential class members had purchased ten or more. A similar situation might exist if the plaintiff had rented a Datsun during this time period and then sought to represent purchasers.

Keeping in mind the need to weigh (a)(3) requirements separately, the claims of plaintiffs in this action do not appear to be atypical. The third requirement has been met.

23(a)(4): The last and most crucial part of subdivision (a) requires the Court to find that the class representatives "will fairly and adequately protect the interests of the class."

Again the plaintiffs treat this very superficially. To quote from the memorandum:

> Rather, the test of fair and adequate representation is directed toward a determination of plaintiff's capability to *effectively prosecute* the action on behalf of the class. (Emphasis supplied).

After announcing that no conflict exists between the representatives and the class, the plaintiffs conclude that this lack of conflict qualifies them under this test. Also mentioned is the experience and ability of plaintiffs' counsel, which is also a consideration.

Responding to this, the defendant concedes only that plaintiffs' counsel are competent and experienced. Two main points are brought up at this juncture:

first, that neither of the two named plaintiffs has any current interest in the continuing effectiveness of the defendant's warranty program (indeed, the defendant notes that PDQ, the Florida plaintiff, has no interest in the ability of the defendant to conduct any of its various functions since the car in question was subsequently resold); and second, neither PDQ nor Scharf, the New York plaintiff, has the funds available to "effectively prosecute" a lawsuit of this magnitude.

The former issue relates to the fairness of the representation. After assuming a potential liability of the defendant amounting to approximately $600 ($200 trebled) per class member, the figures are multiplied to arrive at a total liability of $380 million. Nissan notes that a finding of liability of this magnitude would force the defendant out of business, to the decided detriment of all those potential class members who have need for the continuing availability of warranty work as well as parts and service. A conflict such as this, the defendant argues, should make clear the plaintiffs' impossible position. *See* Free World Foreign Cars, Inc. v. Alfa Romeo, 55 F.R.D. 26 (S.D.N.Y.1972) and Gerlach v. Allstate Insurance Company, 338 F.Supp. 642, 646 (S.D.Fla.1972).[2] Acknowledging that an allegation of conflict between the class representative and the class itself must be scrutinized carefully, the Court is not convinced that the conflict in this instance is more than illusory. For example, the class members who might still have an interest in the viability of the defendant's warranty

---

2. In *Gerlach* the cause of action was based on an alleged violation by the defendant, Allstate Insurance, of the Truth in Lending Act (15 U.S.C. §§ 1638(a), 1639). One of the reasons for denying the requested class action certification was summarized by Judge Mehrtens as follows:

> The maintenance of this action as a class action on the basis asserted in the complaint, even if restricted to Dade County, Florida, . . . [might have] a potential result, if plaintiff's position were sustained,

of rendering Allstate unable to meet its commitments to provide insurance coverage to its policyholders, since the imposition of the $100 penalty with respect to each policyholder would run into approximately a billion dollars and as a consequence plaintiff's position is adverse to those policyholders who would prefer insurance coverage to the $100 penalty and risk of loss of coverage.

338 F.Supp. at 646.

program will most certainly have exhausted that interest (together with the warranty) by the conclusion of this action.[3]

■ The latter, and more real, issue is that challenging the ability of the plaintiffs to adequately protect the interests of the class. At the outset, Nissan mentions the difficulties confronting the plaintiffs in formulating a plan to provide the required notice, *Gerlach, supra* at 646, estimating the cost for a nationwide class at $300,000.00. According to the depositions of the two plaintiffs, neither of them has the funds to provide the type of notice contemplated in Rule 23(c)(2).[4] Also to be considered is the inherent expense of conducting discovery in a complicated antitrust case such as this, especially when that discovery program is sure to include exhaustive examination of the defendant's documents. Evaluation of this factor should enable the Court to determine whether the prospective representative is so undercapitalized that the advantages available to the defendant would make the adversary process a sham, and result in a *res judicata* decision on the merits of the class members' cause of action. *Cf.* Gonzales v. Cassidy, 474 F. 2d 67 (5th Cir. 1973).[5]

3. This comment is not intended to be in any way critical of the time and mileage limitations imposed by the manufacturers on their new car warranties. It only serves to point up the distinction between these factual circumstances and those present in *Gerlach.* Nor should anything said in this regard be construed to imply that potential antitrust defendants may insulate themselves from class action prosecutions by merely extending a warranty on the product sold that extends past the statute of limitations, thereby giving the potential class members an interest that will for all relevant time periods be adverse to the interests of the prospective class representative and prevent the designation of a class.

4. During the deposition of Arthur Scharf the following testimony was elicited:

Q Are you aware of the fact that your attorney in bringing this suit has sought to bring a class action?
A Yes, he told me that.
    *   *   *   *   *
Q Are you prepared to pay for a class action if called upon?
A No.
Q Suppose it were to cost you $100,000, to pull a figure out of the air?
A I couldn't afford that.
Q Could you afford $10,000?
A I certainly wouldn't want to.

Deposition of Arthur Scharf, March 8, 1973, at 35–36.

Burt Arkin, the president of the plaintiff, PDQ, Inc., testified at his deposition on February 26, 1971 as follows:

Q Has anybody told you about the possibility that you may have to pay the expenses of notifying the class in this action?
A No, sir.
Q Have you or your company been told anything about the cost that may be involved in the prosecution of this action?
A No, sir.
    *   *   *   *   *
Q Suppose your company needed a hundred thousand dollars to pay the costs of prosecuting this action; would that money be available?
A No, sir.
Q Would you borrow to pay the costs of this action?
A No, sir.

Deposition of Burt Arkin at 45–46.

5. Inadequate representation by the class representative was the basis for setting aside a District Court's application of the *res judicata* doctrine to the plaintiff's cause of action in Gonzales v. Cassidy, 474 F.2d 67 (5th Cir. 1973). Although the inadequacy of the representative of the previous class was found in his failure to file an appeal from the judgment of the three-judge court granting the named plaintiff retroactive relief and the class members prospective relief only, Gaztan v. Cassidy, No. 5A 69CA 153 (W.D.Tex., June 30, 1971, amended August 19, 1971), the Court noted that one of the requirements of 23(a)(4) is that "it must appear that the representative will vigorously prosecute the interests of the class through qualified counsel." 474 F.2d at 72. The financial means of the representative, bearing as it does on the vigor of the prosecution, becomes an important area of inquiry for the Court. The reversal in *Gonzales* relied on a determination by the Court of Appeals that the representative's [Gayton] conduct was such

The defendant correctly pointed out that Mr. Scharf, in his deposition, stated that he had no idea of the cost that might be involved in the bringing of a class action, and additionally that he would be willing to invest no more than $1,000 in the prosecution of the suit. Further questioning revealed that PDQ would not borrow a large sum of money to pay the costs of this class action.

Without even considering the question of attorneys' fees,[6] a proper conducting of this cause as a class action will require pretrial expenditures by the plaintiffs in excess of $10,000. This estimation could fluctuate significantly depending on the size of class declared and the length of the discovery period provided by the Court. Combining this cost with the expense incident to providing the notice to the class member required by Rule 23(c)(2) results in a total of anywhere between $25,000 and $250,000, with the final determination depending on, and correlating very closely with, the size of the class allowed.

■ Should the Court's evaluation be limited at this point to the depositions of the two plaintiffs, the representatives could not be considered adequate for the purposes of subdivision four. Eisen v. Carlisle & Jacquelin, 479 F.2d 1005, 1016 (2d Cir. 1973). Further consideration is appropriate, however, since the attorneys for the plaintiffs, at the hearing on this request, announced into the record their willingness to advance to the plaintiffs some of the necessary costs of notice and litigation expenses.[7]

that due process would be violated by giving *res judicata* effect to the judgment. "This is the crucial issue when the judgment in a class action is under collateral attack." Id. at 73: In explaining the procedures followed, the Court commented that the inquiry "involves a review of the class representative's conduct of the entire suit—an inquiry which is not required to be made by the trial court but which is appropriate in a collateral attack on the judgment such as we have here." Id. at 72. While this observation is certainly correct, there is no impediment to the District Court's attempting to ferret out information that would give a clear indication that the class action would be conducted in such a way as to prevent the giving of *res judicata* effect to the judgment once it is received. Such an attempt of the District Court's part would merely result in a saving of judicial time in the end. The commitment of financial resources is therefore a relevant area for consideration.

6. The defendant in his brief has assumed that the plaintiffs' attorneys are working on a contingency basis. Defendant's Memorandum of Points and Authorities in Opposition to Plaintiffs' Motion for Class Action Determination, at 24. The Court will do likewise. As one law review article has commented:
    The lawyer who agrees to handle a class action on a contingent fee basis has not done anything unethical. If the action is successful, the attorney must apply to the court for his fee. The court is ordinarily familiar with the services performed by counsel. . . .

Patrick and Cherer, Rule 23 and the Class Action for Damages: A Reply to the Report of the American College of Trial Lawyers, 28 Bus.Law. 1097, 1111 (1973).

7. The dialogue was as follows:
    Court: What's your position if the costs are to be borne by the plaintiffs with respect to the notice?
    Mr. Kurland: If the cost is required to be borne by the plaintiffs, and we can't have this sent out through the distributors and through the defendants themselves, I think I am prepared to say, Your Honor, that with respect to the class we are seeking that we cannot provide the cost of notice on a nationwide class action. However, if it were something less than a nationwide class action, and I don't at this point know—I think that we would need further discussion and perhaps some discovery to know the extent of it—we, the attorneys in the case, would be willing to advance, on behalf of the members of the class, the cost of some notice or whatever the class might be. I think I have to represent to Your Honor, that if the cost of notice is put on us and we can't use this alternative procedure for nationwide class, we will not be able to pay for it. But we think that on some limited basis it could be done.
        *        *        *        *        *
    Mr. Kurland: I am advised by—I have a note here from my co-counsel that says we are willing to pay notice insofar as printing costs on a national scale. I see. It is the postage we would escape through

This advancement would presumably be made pursuant to Canon 5, Disciplinary Rule 5–103(b) of the Code of Professional Responsibility which provides:

> While representing a client in connection with contemplated or pending litigation, a lawyer shall not advance or guarantee financial assistance to his client, except that a lawyer may advance or guarantee the expenses of litigation, including court costs, expenses of investigation, expenses of medical examination, and cost of obtaining and presenting evidence, provided the client remains ultimately liable for such expenses.

As is usually the case, reference to rule or statute making a certain type of activity permissible under specified conditions does not result in a final, dispositive decision as to the application of that rule or statute in the exact circumstances before the Court. Further uncertainty and confusion is engendered because of the rule involved in this instance—a rule of ethics for which little precedent of a definitive nature exists. Guidance is provided by the ethical considerations under the various Canons, however, and at least two such considerations appear relevant here. The seventh one provides in part that:

> The possibility of an adverse effect upon the exercise of free judgment by a lawyer on behalf of his client during litigation generally makes it undesirable for the lawyer to acquire a proprietary interest in the cause of his client or otherwise become financially interested in the outcome of the litigation. . . . Although a contingent fee arrangement gives a lawyer a financial interest in the outcome of the litigation, a reasonable contingent fee is *permissible in civil cases because it may be the only means by which a layman can obtain the services of a lawyer of his choice.* . . . (Emphasis supplied).

Although this deals more explicitly with the question of attorneys' fees, it does enunciate the rationale behind allowing such fees which also is applicable to advancement. The next consideration is more on point.

> A financial interest in the outcome of litigation also results if monetary advances are made by the lawyer to his client. Although this assistance generally is not encouraged, there are instances when it is not improper to make loans to a client. For example, the advancing or guaranteeing of payment of the costs and expenses of litigation by a lawyer may be the only way a client can enforce his cause of action, but the ultimate liability for such costs and expenses must be that of the client.

The tenor of both these provisions indicates the approval of these type of financial arrangements between lawyer and client, especially as to the advancements, as a necessary evil, but only in certain narrowly confined circumstances; to wit, when without such advancements the client would be precluded from exercising his right to a remedy provided by law.

How then does this Code section, with its corresponding ethical considerations, interrelate to the facts *sub judice?* The Court is confronted with an allegation made by two automobile purchasers that Nissan, U.S.A., fixed the retail sales price of Datsun automobiles (a *per se* violation of the antitrust laws, if proven), refused to deal with brokers who would resell the cars at a discount, and allocated the territorial marketing areas for its dealers. The complaint, sounding as it does in antitrust theory, presents the classic example of the pri-

---

the Nissan distribution system. That is where the big cost is. The cost of printing the notice is not that exhorbitant. It is the fact that it has to be mailed. If

there are already making mailings it is nothing to include it within their regular mailing.

\*    \*    \*    \*    \*

vate civil suit to enforce the antitrust laws, well recognized as an important tool by the United States Supreme Court in State of Hawaii v. Standard Oil Co. of California, 405 U.S. 251, 262, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972), Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 130–131, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969), and Perma Life Mufflers, Inc. v. International Parts Corp., 392 U.S. 134, 147, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968). "By offering potential litigants the prospect of a recovery in three times the amount of their damages, Congress encouraged these persons to serve as 'private attorneys general.' " *Hawaii, supra* at 262 of 405 U.S., at 891 of 92 S.Ct.

If two individual complainants were concerned solely with the recovery of damages incurred by them because of the antitrust violations alleged, the cost of the litigation would probably still be prohibitive despite the eventual trebling of damages so found. That cost, however, would not include the additional expenditure necessary for notice previously discussed because the plaintiffs would be representing no one but themselves. When the considerations of Disciplinary Rule 5–103(b) are coupled with the acknowledged desirability of private antitrust enforcement, it seems clear that the attorney representing a potential plaintiff may ethically advance the costs of litigation, subject of course to the requirement that the plaintiff remain ultimately liable. Assuming the success of the action, Section 4 of the Clayton Act provides for the recovery of "threefold the damages by him sustained, and *the cost of suit, including a reasonable attorney's fee.*" [8] If the representation is taken on a contigent fee basis, the failure to make out a compensable cause of action will not leave the plaintiff responsible for the actual attorney's fees, although he still must repay the attorney for the costs incurred.

When the costs so advanced include the amount necessary to effect notice consistent with the standards of due process, however, the amount that the client becomes ultimately responsible for can easily outstrip any funds theoretically available for reimbursement. In this instance, the deposition testimony reveals that the plaintiffs will not willingly advance more than a few thousand dollars. Is the Court required to believe that they will willingly guarantee reimbursement of an amount possibly in excess of the outer limits defined in their respective depositions should the cause of action fail? And even if this representation is made, could not the Court look beyond it to determine whether, should that eventuality ever result, any attempt to collect on that guarantee would be doomed from the start.

Much has been written about the ethical problems inherent in the day-to-day functioning of Rule 23. The evils of client solicitation, stirring up litigation and advertising confront every Court when class action treatment has been requested. "Courts have attempted through appropriate orders to minimize conflicts arising from alleged client solicitation," [9] but what steps are available to minimize the conflicts present when counsel are financing the litigation —a financing potentially without reimbursement—is not clear. Perhaps this has only become a difficult issue since the Second Circuit's most recent opinion in *Eisen* forbidding the conducting of a "mini-hearing" to determine the equities and thereby further determine "which party is to be required to pay for mailing, publishing or otherwise giving any notice required by law." Eisen v. Carlisle & Jacquelin, 479 F.2d 1005, 1015 (2d Cir. 1973). Professor Miller made these observations at the Judicial Conference of the Fifth Judicial Circuit:

It seems clear that the judicial treatment accorded notice costs is in a

8. 15 U.S.C.A. § 15 (1973)

9. Note, Developments in the Law of Federal Class Action Litigation—Catch 22 in Rule 23, 10 Houston L.Rev. 337, 378 (1973).

state of flux. However, a rule of reason appears to be emerging. It is true that a few courts have said that if class representatives cannot bear the cost of the notice the action must be dismissed, on the ground that to do otherwise might alter the applicable substantive law or shift the litigation balance of power. But this is too facile an application of the single plaintiff-single defendant paradigm and ignores the special status of the class action. Mass litigation requires that certain adjustments in the "norm" be made in order to reap the benefits of the class action procedure. 58 F.R.D. 299, 323–324.

No attempt is made here to pre-judge the ethical aspects of an advancement by the attorney to the class representatives of the funds necessary to accomplish the notice mandated under *Eisen*. It affirmatively appears that the plaintiffs have some funds with which notice may be financed if the class is limited on a geographical basis. Should the money available not be sufficient and an advancement be necessary, it may be appropriate for counsel at that point to determine authoritatively the propriety of such conduct.

## II

In light of this discussion, two conclusions are apparent: (1) A nationwide class consisting of all purchasers of Datsun automobiles from 1968 to 1972 is not feasible because of the plaintiffs' inability to perfect the notice required under Rule 23; and (2) as to those purchasers to whom notice can be given by the plaintiffs, all of the other prerequisites of Rule 23 have been met and a class action should be declared. Therefore, pursuant to this Court's discretion under Rule 23, the class is hereby declared to be:

1. All purchasers of Datsun automobiles from July 17, 1968 to July 17, 1972;

2. Who purchased the automobiles in question either in New York County, New York or Dade County, Florida during the above-described time frame.

In addition, pursuant to Rule 23(c)(4) the class will be maintained only for the purpose of determining:

1. whether in fact a conspiracy as described in the complaints existed;

2. whether that conspiracy, if proven, restrained trade; and

3. whether that restraint, if proven, affected interstate commerce.

The question of damages suffered by each individual purchaser will not be included within the class action. It may be appropriate at some later date to review the definition of class in order to determine whether a division into subclasses of purchasers would be appropriate and that decision is reserved for such subsequent review.

Accordingly, counsel for the plaintiffs shall prepare and submit within two weeks to the Court and opposing counsel, for their comment, a proposed form of notice to be sent to the respective class members. Any objection to the form should be filed within five days thereafter.