**Ortha H. and Gertrude SAYRE et al.**

v.

**ABRAHAM LINCOLN FEDERAL SAVINGS & LOAN ASSOCIATION et al.**

Civ. A. No. 72-2269.

United States District Court,
E. D. Pennsylvania.

Oct. 11, 1974.

Arnold Levin, Philadelphia, Pa., for plaintiffs.

Walter R. Milbourne, Philadelphia, Pa., for defendants.

## MEMORANDUM AND ORDER

NEWCOMER, District Judge.

Presently before the Court are a number of discovery motions the resolution of which will have a serious impact on the maintainability of this suit as a class action and which may have a serious impact on the fate of other putative class actions. The defendants herein, a group comprised of numerous banks and lending associations in the Eastern District of Pennsylvania, have ques-

tioned the named plaintiffs at deposition concerning, *inter alia*, the extent of their financial assets, their understanding of how the costs of prosecuting this suit are to be met, and their understanding of their arrangement with their counsel for meeting these costs. Defendants claim that these questions are relevant in determining whether this suit can be maintained as a class action under Rule 23(a)(4) and 23(b)(3)(D). In addition, defendants seek information from those named plaintiffs who are union officials concerning the origin of several identical letters from a number of unions to their members which discuss the facts of this suit and refer any interested members to plaintiffs' counsel (who is also counsel for the unions). Plaintiffs move for a protective order on the grounds that the questions specified above are irrelevant to the class action issue and that, with the exception of the questions concerning plaintiffs' financial worth, they inquire into areas protected by the attorney—client privilege.

We find that plaintiff union officials need not answer any questions concerning the origin of the letters, since even were we to conclude that plaintiffs' counsel had prompted the letters and had themselves drafted them, such conduct on counsels' part would be protected by the Supreme Court decisions concerning the right of associations, including labor unions, to advise members of their rights and of ways to vindicate them. United States Transportation Union v. State Bar of Michigan, 401 U.S. 576, 91 S.Ct. 1076, 28 L.Ed.2d 339 (1971); United Mineworkers of America v. Illinois Bar Association, 389 U.S. 217, 88 S.Ct. 353, 19 L.Ed.2d 426 (1967); Brotherhood of Railroad Trainmen v. Virginia ex rel. Virginia State Bar, 377 U.S. 1, 84 S.Ct. 1113, 12 L.Ed.2d 89 (1964). As for the questions concerning the ability of plaintiffs to pay the expenses of this suit, including the costs of notice to the class, we find that such

questions need not be answered since plaintiffs' counsel have stated for the record that they are advancing the plaintiffs amounts necessary to cover such costs. While defendants contend that the financial information is still relevant in determining whether plaintiffs' counsel could reasonably expect reimbursement from plaintiffs should the suit fail, and thus to whether plaintiffs' counsel are maintaining this suit (conduct which would render them inadequate representatives of the class), we find that such information remains irrelevant since an unrealistic or unreasonable expectation of reimbursement standing alone, does not render plaintiffs' counsel (and therefore plaintiffs) inadequate representatives of a class.

All other questions shall be answered except insofar as they involve communication between plaintiffs and their counsel or those retained by counsel in advancement of this litigation.

## DISCUSSION

### Introduction

This action involves a suit by some eighty named plaintiffs, each a mortgagor of one of the defendants, against the majority of the banks and lending associations in the Eastern District of Pennsylvania. Plaintiffs allege that these institutions require their mortgagors to prepay, in monthly installments, a sum equal to one-twelfth the annual expected property tax, mortgage insurance premiums, sewer and water rentals, and other possible liabilities which, if not paid, might result in a lien on the mortgaged property. The banks then hold this money in escrow without either paying mortgagors any interest on it or without deducting it from the balance owed upon which mortgagors must pay interest ("principal debt balance method"). Plaintiffs allege that the banks switched from the principal debt balance method to the escrow method (no principal reduction, no interest) as a result of

a conspiracy, in violation of the Sherman Act, Section 1, 15 U.S.C.A. § 1 (1898).

The Court is now faced with plaintiffs' request for a certification of class under Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure. The discovery out of which the present motions grew is being taken on the question of whether this action is a proper class action.

I. Solicitation and Adequate Representation

Defendants move to prohibit communication by any party, or their counsel, with potential class members without the prior consent of this Court. The order they propose is identical to the one suggested in the Manual for Complex Litigation for use in every case brought as a class action. Manual for Complex Litigation (1973 ed.) at p. 146. Neither side objects to its adoption, and it shall be adopted.

However, its adoption does not resolve a question created by a series of similar letters sent by certain unions, which are clients of plaintiffs' counsel in other matters, to their membership. (A copy of one of the letters is found in Appendix A of this memorandum). Although this letter does not mention the present suit by name, it discusses the facts involved in this suit and advises the members to get in touch with plaintiffs' counsel if they have "purchased any property and given a mortgage".[1]

This matter is before us because plaintiffs seek a protective order against questions put to plaintiffs who are officials of the unions circulating the letters discussed above. These questions seek to discover whether counsel or the union initialed and drafted this letter, the argument being that if it were shown that counsel had originated the letter,

they would be guilty of unethical conduct (i. e., solicitation) and thus inadequate representatives of the class under Rule 23(a)(4). Stavrides v. Mellon National Bank and Trust Company, 60 F.R.D. 634 (W.D.Pa.1973).

The parties to a lawsuit may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action. Fed.Rule Civil Procedure 26. Before we reach the question of privilege raised by plaintiffs' counsel, we must determine the relevance of these questions to some issue involved in this case. We refuse to allow these questions because we are convinced that even if plaintiffs' counsel prepared the letters and requested that they be sent, this would not constitute unethical conduct and thus is irrelevant to the class action issue. There is no question that organizations such as these unions may lawfully inform their members of their rights and refer them to particular counsel in order to assert such rights. Brotherhood of Railroad Trainmen v. Virginia ex rel. Virginia State Bar, 377 U.S. 1, 84 S.Ct. 1113, 12 L.Ed.2d 89 (1964). Nor can it be doubted that counsel retained by a union may lawfully advise his client concerning the rights of its members and the steps which should be taken to protect them. The fact that these two lawful activities may have been combined in this suit does not render them any less lawful.

II. Manageability and Adequate Representation

Defendants have asked several of the named plaintiffs questions concerning their financial assets, their knowledge of the necessity of paying

---

[1]. The letter incorrectly characterizes a recent Pennsylvania Supreme Court case, Buchanan v. Brentwood Federal Savings and Loan Association, Pa., 320 A.2d 117 (1974), as holding that all interest over 10% earned by a bank on the monthy tax and premium prepayments belongs to the mortgagors. In fact, the Supreme Court merely stated that plaintiffs had stated a valid cause of action under Pennsylvania law, and took no position one way or the other on the merits.

the expenses of the litigation as it proceeds, and their willingness to pay the costs of the suit should they fail to win. One of plaintiffs' counsel directed his clients not to answer these questions, but himself volunteered that there was an agreement between plaintiffs and counsel that counsel's firm would advance plaintiffs amounts to cover the expenses of the litigation as they arose, but that plaintiffs would be required to reimburse counsel for all expenses should plaintiffs lose.

Defendants' questions are obviously intended to elicit information which will aid this Court in determining whether plaintiffs have sufficient resources to adequately represent the class under Rule 23(a)(4), and whether this action, were it to be declared a class action, would be economically as well as administratively manageable. Rule 23(b)(3)(D) states that a matter pertinent to the findings that must be made before an action can proceed as a class action under 23(b) are the difficulties likely to be encountered in the management of a class action. "Commonly referred to as 'manageability,' this consideration encompasses the whole range of practical problems that may render the class action format inappropriate for a particular suit." Eisen v. Carlisle & Jacqueline, 417 U.S. 156, 94 S.Ct. 2140, 2146, 40 L.Ed.2d 732 (1974) (Powell, J.). This consideration became particularly important with the Supreme Court's ruling in *Eisen,* cited *supra,* that the plaintiff must bear the entire cost of notifying the class pursuant to 23(b)(3) and that individual notification was required to all class members who could reasonably be identified.

However, in this case, plaintiffs' attorneys have expressed their intention to advance plaintiffs all the expenses of this litigation, including the costs of notifying the class. Whether counsel

can and will pay the expenses of suit, rather than whether plaintiffs can afford them, becomes the relevant question, to which questions concerning the plaintiffs' financial status are irrelevant.

The propriety of an advancement of funds by an attorney to his client is governed by Canon 5, Disciplinary Rule 5-103(B), of the Code of Professional Responsibility, which provides:

"While representing a client in connection with contemplated or pending litigation, a lawyer shall not advance or guarantee financial assistance to his client, except that a lawyer may advance or guarantee the expenses of litigation, including court costs, expenses of investigation, expenses of medical examination, and costs of obtaining and presenting evidence, provided the client remains ultimately liable for such expenses."

The agreement between counsel and plaintiffs in this case, as it was stated by plaintiffs' counsel, conforms to the language of the Canon. Such an agreement has been held appropriate in the class action context by at least one court. Halverson v. Convenient Food Mart, Inc., 458 F.2d 927, 931 fn. 7 (7th Cir. 1972).[3] Indeed, this type of arrangement would seem to be a predictable element of any putative class action brought by plaintiffs with individually small damage claims or whose individual resources are limited.

A large-scale antitrust class action involving numerous homeowners such as the present lawsuit seems to fit the example given by the ABA Committee's evaluation of the Code of Professional Responsibility of the circumstances in which a loan to a client is proper:

" . . . the advancing of guaranteeing of payment of the costs and expenses of litigation by a lawyer (subject to reimbursement) may be

3. The court in P.D.Q., Inc. of Miami v. Nisson Motors, 61 F.R.D. 372 (S.D.Fla.1973), left open the question of the propriety of an

attorney's advancing his client the sums necessary to cover the costs of notifying members of the class.

the only way a client can enforce his cause of action . . ." Canon 5, Ethical Consideration 5–8, Code of Professional Responsibility.

Although the Supreme Court's opinion in *Eisen* underscores the necessity of examining the ability of plaintiffs to pay the cost of notifying the class in a 23(b)(3) action, that opinion does not state or even imply that plaintiffs' counsel cannot advance plaintiffs the necessary amounts.

■ Of course, this Court need not accept at face value counsel's contention that his firm will advance all the funds necessary to effectively prosecute this action in the name of the class which may ultimately be certified. We could require plaintiffs to post a bond to cover the probable future expenses of the suit, including notification costs, as a precondition to any 23(b)(3) certification. Should plaintiffs fail to meet any expenses during the pendency of this suit, we could "decertify" the class in order to protect the members of the class from the *res judicata* effects of a suit in which they were inadequately represented. Korn v. Franchard, 456 F.2d 1206 (2nd Cir. 1972); Kallen v. Nexus Corp., 54 F.R.D. 610 (N.D.Ill. 1972).

## III. Maintenance and Adequate Representation

The fact that plaintiffs' counsel have agreed to advance the costs of litigation does not, defendants assert, make irrelvant the plaintiffs' ability to pay those costs, even if the Court takes measures to insure that those costs will be met as they arise. Defendants contend that should it appear from deposition that the named plaintiffs are unable or unwilling to pay the costs of notice and suit as such costs are incurred, it would be unreasonable to expect them to repay counsel for the funds advanced, and if counsel were advancing funds without reasonable expectation of repayment they would be maintaining the

suit, a breach of ethics which renders them unfit to represent the class pursuant to Rule 23(a)(4). This line of reasoning was followed by the Court in P. D. Q., Inc. of Miami v. Nisson Motor Corp., 61 F.R.D. 372 (S.D.Fla.1973).

In *P. D. Q., Inc.* the Court was faced with plaintiffs' counsels' statement that they would advance plaintiffs the costs of the suit, including the costs of notice. The corporate plaintiff had stated on the record that it was unwilling to borrow large sums to meet any expenses, and the remaining plaintiff, an individual, had declared that he would invest no more than $1,000 (One Thousand Dollars) towards prosecuting the action. The Court took note of plaintiffs' counsels' intention to loan plaintiffs the necessary funds, and declared:

"When the costs so advanced include the amount necessary to effect notice consistent with the standards of due process, however, the amount that the client becomes ultimately responsible for can easily outstrip any funds theoretically available for reimbursement. In this instance, the deposition testimony reveals that the plaintiffs will not willingly advance more than a few thousand dollars. Is the Court required to believe that they will willingly guarantee reimbursement of an amount possibly in excess of the outer limits defined in their respective depositions should the cause of action fail? And even if this representation is made, could not the Court look beyond it to determine whether, should that eventuality ever result, any attempt to collect on that guarantee would be doomed from the start." 61 F.R.D. at 380.

The Court estimated that the costs of notice and other expenses would vary between $25,000 and $250,000 depending on the size of class ultimately allowed. The Court found that in order to "minimize the conflicts present when counsel are financing the litigation—a financing potentially without reimbursement—"

the class would be narrowly defined so that the cost of notifying it (and prosecuting an action in its name) would be within the named plaintiffs' means. This meant a reduction from a nationwide class of Datsun purchasers to two sub-classes, one composed of purchases of Datsun automobiles from July 17, 1968 to July 17, 1972 within Dade County, Florida, the other composed of Datsun purchasers in New York City during the same time period.

We do not disagree with the proposition that unethical conduct by plaintiffs' counsel may impair his ability to adequately represent the class under Rule 23(a)(4). The cases so holding are legion. Korn v. Franchard, 456 F.2d 1206 (2nd Cir. 1972) (solicitation); P. D. Q., Inc. of Miami v. Nisson Motors Corp., cited supra; Stavrides v. Mellon National Bank and Trust Company, 60 F.R.D. 634 (W.D.Pa.1973) (solicitation and maintenance); Carlisle v. L. T. V. Electrosystems, Inc. 54 F.R.D. 237 (N.D. Texas 1972) (solicitation); Simon v. Merrill Lynch, Pierce, Fenner and Smith, Inc., 16 F.R.Serv.2d 1021 (N.D.Texas 1972) (solicitation); Taub v. Glickman, 14 F.R.Serv.2d 847 (S.D.N.Y.1970) (solicitation); But see Halverson v. Convenient Food Mart, Inc., 458 F.2d 927 (7th Cir. 1972) (only gross misconduct renders plaintiffs' counsel inadequate class representative). But we do feel the simple fact that the sums which plaintiffs' counsel are advancing plaintiffs to meet the admittedly high costs of litigation may greatly exceed the resources of the plaintiffs should be the basis of an argument that a class

should not be declared. Unlike the instances of solicitation [4], which have fortunately proven to be the exception rather than the rule in the class action context, the question of the plaintiffs' ability to reimburse counsel will predictably reappear whenever counsel is advancing funds to plaintiffs. It is this Court's judgment—admittedly based on experience and hunch rather than any collected empirical data—that to deny a class whenever plaintiffs' counsel advances significant funds to plaintiffs of little or modest means would be to defeat the very purposes which class actions were designed to achieve. This is particularly true where, as here, the costs of litigating the suit would exceed the damages allegedly sustained by an individual plaintiff. In other words, in precisely those cases where the class action device is most appropriate the disparity between the costs of litigation and the resources of the individual plaintiffs will be most pronounced. As much as we are concerned with possible unethical conduct by counsel, we cannot condone a policy which would effectively limit class action plaintiffs to corporations, municipalities, or the rich.

We do not question the wisdom of the Court's decision in P. D. Q., Inc. to limit the size of the class. When possible this device seems entirely appropriate to minimize the conflicts which might be created by the advancement of significant funds by plaintiffs' counsel. Suffice it to say, however, that no such limitation would be feasible in this case.

Of course, were the questions concerning plaintiffs' understanding of

4. Solicitation may be a form of abuse more likely to occur in the class action context than in the setting of the individual plaintiff's action. This is because of the notice provisions of 23(c)(2) which require communication between plaintiffs' counsel and class members (although such notice must have the prior consent and approval of the Court). Thus because plaintiffs are class or putative class members plaintiffs' counsel will come into possession of names and addresses of numerous individuals as well as a judicially-

sanctioned means of approaching those individuals. Indeed, in certain cases the courts have been faced with abuse of the official notification process. Korn v. Franchard, C.C.H.Fed.Sec.L.Rep. § 92, 845 (S.D.N.Y. 1970); Kronenberg v. Hotel Governor Clinton, Inc., 281 F.Supp. 622 (S.D.N.Y.1968). However, there seems to be no reason to believe that maintenance is more likely in the class action context than in any large-scale action involving plaintiffs of modest means.

their fee and costs arrangement to reveal a widespread expectation among plaintiffs that they were free from ultimate liability for funds advanced by counsel, or any other evidence that plaintiffs' counsel were maintaining this suit, then perhaps the extent of plaintiffs' assets would become relevant as supportive evidence in determining whether plaintiffs' counsel were ethically adequate representatives of the class. But until some independent evidence is brought to this Court's attention we can see no purpose to be served by the costly and time consuming process of inquiring into plaintiffs' financial status.

We do not believe that the decision of the Court in Stavrides v. Mellon National Bank and Trust Company, 60 F.R.D. 634 (W.D.Pa.1973), is opposite to the conclusion reached here.

In *Stavrides* the Court ordered the named plaintiffs in a putative class action factually similar to the present one to answer questions concerning liability for costs and fees. Plaintiffs had been asked whether they had agreed to pay attorney fees or the costs of the action and whether they had been told that they might be required to pay the costs of prosecuting their action. 60 F.R.D. at 638. The Court found these questions reasonably calculated to lead to the discovery of information on the issue of maintenance, which was in turn relevant in determining whether plaintiffs' counsel was "ethically as well as intellectually competent to represent (the class)". 60 F.R.D. at 637. The Court declared:

> " . . . [W]e think that defense counsel may inquire into the professional conduct of plaintiffs' counsel to attempt to discover disabling breaches of the Code of Professional Responsibility which would prevent plaintiffs' counsel from 'vigorously and forthrightly taking up the cause

of the class they seek to represent' [citing Taub v. Glickman, 14 F.R.Serv. 2d 847, 849 (S.D.N.Y.1970)]." 60 F.R.D. at 637.

*Stavrides* does not say that defendants are entitled to discover plaintiffs' financial assets in order to support an inference that the suit is being maintained. It merely states that defendants may discover what plaintiffs had been told concerning their liability for expenses and the nature of their agreement with counsel concerning the payment of litigation expenses. As stated in section IV, below, we also will allow questions as to plaintiffs' understanding of their liability for expenses, as long as these questions do not compel plaintiffs to divulge confidential communications with their counsel.[5]

Our opinion should not be construed as saying plaintiffs' counsel has or has not engaged in unethical practices, but only that certain facts should not immediately be seen as creating the potential for abuse of the class action process. Absent more compelling evidence of maintenance, it is for the Disciplinary Board of the Bar rather than this Court in a class action certification context to determine the propriety of plaintiffs' counsels' conduct in this matter. Halverson v. Convenient Food Mart, Inc., 458 F.2d 927 (7th Cir. 1972).

IV. Other Questions

■ We find that no valid objections exist to defendants' questions concerning plaintiffs' understanding of their fee agreement with their counsel, their knowledge of how other plaintiffs became involved in the instant litigation, of their understanding of their responsibilities for costs and expenses of notice, as long as these questions are not framed so as to compel plaintiffs to disclose communications with their counsel.[6]

---

Appendix to follow

5. The fact that questions concerning fees and expenses might infringe on the attorney-client privilege was mentioned but not discussed in *Stavrides*.

6. Of course plaintiffs may validly waive this privilege as long as such waiver is knowing and voluntary.

APPENDIX A

INTERNATIONAL UNION OF OPERATING ENGINEERS
LOCALS 542, 542–A, 542–B, 542–C, 542–D

Philadelphia District #1 Office
248 North 12th Street
Phone: Locust 3–7764
Philadelphia, Pa., 19107

May 14, 1974

TO ENTIRE MEMBERSHIP

Dear Brother:

If you are paying off a mortgage on your home, this may be important to you.

We are writing to bring to your attention a recent decision rendered by the Supreme Court of Pennsylvania which we feel may be of importance to many of our members who are buying homes on which they are paying off mortgages.

As a general rule, in addition to making your regular mortgage payments; the banks require you to pay your real estate taxes, insurance premiums and other assessments on a monthly basis even though these funds are not due until the end of the year. The banks and mortgage companies use the monies for their own interest or earn interest on them. The recent decision from the Supreme Court has held that with respect to these monthly payments for taxes and insurance premiums, that all monies which are earned on them either at the present interest rate of ten percent or otherwise, belong to the borrowers and that such interest or other returns on the monies must be returned to the borrowers.

Our attorneys, Messrs. Freedman, Borowsky and Lorry, argued the case in the Supreme Court and were successful in obtaining the proper decision. They have commenced a class action on behalf of other persons who have borrowed money from the banks and mortgage companies to buy homes. If you have purchased any property and given a mortgage, we recommend that you get in touch with our counsel and seek their assistance. The monies which may be reimbursable to you over the years may be quite substantial.

For any further information, please do not hesitate to contact this Union office.

Fraternally yours,
(s) Robert Walsh
Business Manager

RW:bl