Marian LIM, on behalf of herself and all others similarly situated, Plaintiff,

v.

CITIZENS SAVINGS AND LOAN ASSOCIATION, a corporation, Defendant.

No. C–75–1822 WHO.

United States District Court,
N. D. California.

Dec. 22, 1976.

Elizabeth G. Leavy, Carroll, Burdick & McDonough, San Francisco, Cal., for plaintiff.

A. James Robertson, II, Lawrence L. Curtice, Howard, Prim, Rice, Nemerovski, Canady & Pollak, San Francisco, Cal., for defendant.

## OPINION AND ORDER

ORRICK, District Judge.

Plaintiff, Marian Lim, an Asian female formerly employed by the defendant, Citizens Savings and Loan Association (Citizens), charges Citizens with discriminating against her, first, by failing to promote her and, second, by discharging her. She brings this suit under Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e *et seq.*), as well as under 42 U.S.C. § 1981, and moves to certify a class under Rule 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure. This case is here on plaintiff's motion for class certification and defendant's motion for summary judgment with respect to plaintiff's individual claim. For the reasons hereinafter stated, the Court denies the motion to certify the class and grants defendant's motion for summary judgment.

### I.

The original complaint in this action was filed on August 29, 1975; subsequently, plaintiff filed an amendment adding reinstatement to her demands for relief. Specifically, the class complaint on behalf of female and Asian employees charges discriminatory practices with respect to, *inter alia*, compensation, promotion, testing and rating, leaves of absence, and opportunities for on-the-job training.

In addition, the complaint alleges that Citizens was in violation of 42 U.S.C. § 2000e–2(a) and 42 U.S.C.A. § 1981 in that it refused to promote and subsequently discharged plaintiff solely because of her race and sex.

Plaintiff worked for Citizens from 1960 until April 1, 1974, when she took a medical

leave of absence. During that time she filled a variety of positions, mostly as a clerk of one sort or another, though she allegedly developed thereby some expertise in the more managerial aspects of banking (loan policies, auditing, etc.).

The individual aspect of this lawsuit is based on two alleged incidents of discrimination. First, in January, 1970, plaintiff was transferred from her allegedly supervisory position in the Insurance Department to the position of Installment Credit Clerk. Plaintiff alleges that she consented to this transfer on the promise that she would be promoted to Installment Loan Officer if she helped set up the new Installment Loan and Credit Department. However, as the Department expanded, a Caucasian male and not plaintiff was hired as Loan Officer.

Second, in May 1974, while on a two month medical leave of absence, plaintiff was notified that her job as Loan Documentation Auditor would be terminated. Plaintiff's co-worker, a Caucasian female, allegedly continued to work as Loan Documentation Auditor until November, 1974, when her position was terminated as well. In June, 1974, Citizens hired, at a salary higher than plaintiff's, a Caucasian male as Senior Loan Auditor. The Senior Loan Auditor position was a newly created job classification designed to supersede the Loan Documentation Auditor positions. Thus, plaintiff and her co-worker were effectively replaced.

## II.

Plaintiff here seeks certification of a Federal Rules of Civil Procedure 23(b)(2) class for the purposes of this lawsuit. Defendant opposes certification on essentially two grounds, namely: (1) there *is* no class, particularly with regard to the typicality

requirement of Rule 23(a)(3) of the Federal Rules of Civil Procedure, and (2) plaintiff is not an adequate representative of any class there might be. Fed.R.Civ.P. 23(a)(4).

## A.

" * * * By definition an essential prerequisite to a class action is the existence of a 'class'. However, numerosity alone does not create a right; therefore, given a purported class, the individual members must possess a right or rights." 3B J. Moore, *Federal Practice* ¶ 23.04, at 23–251 (2d ed. 1975).

■ This requirement of the existence of a class has occasionally been viewed in the context of the requirement (Fed.R.Civ.P. 23(a)(3)) that the claims or defenses of the representative parties be *typical* of the claims or defenses of the class. *Taylor v. Safeway Stores, Inc.*, 524 F.2d 263 (10th Cir. 1975). *See also Kinsey v. Legg, Mason & Co.*, 60 F.R.D. 91 (D.D.C.1973).[1]

■ It is beyond dispute that the party seeking certification (plaintiff here) bears the burden of establishing that the action meets the requirements of Rule 23 of the Federal Rules of Civil Procedure. *Nguyen Da Yen v. Kissinger*, 70 F.R.D. 656 (N.D. Cal.1976); *Rodriguez v. East Texas Motor Freight*, 505 F.2d 40 (5th Cir. 1974).

How then is the trial court to determine whether plaintiff has met this burden, in this case the burden of establishing the existence of a class?

The Supreme Court in *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1973), has made clear that preliminary inquiries into the merits of a lawsuit are improper in the context of class certification. Although the *Eisen* rule has evolved into a wedge for broad class certifi-

---

1. The typicality requirement of Rule 23(a)(3) of the Federal Rules of Civil Procedure has been stated as follows:

 "Rule 23(a) does not require that the claims of the representative be identical to those of the class members, but that they be typical. If all the members of a purported class would be benefited by the suit the plaintiff seeks to bring, the requirement of

 typicality has been satisfied." *Souza v. Scalone*, 64 F.R.D. 654, 657 (N.D.Cal.1974).
 Clearly, under this formulation, if plaintiff cannot show or adequately allege the existence of a class, plaintiff will likewise be unable to show that there *is* anyone but herself who might benefit from her suit. Again, class existence and typicality are highly related prerequisites of Rule 23.

cation by *plaintiffs*, a close reading of the *Eisen* case indicates the Supreme Court's contrary intention to protect *defendants*:

"We find nothing in either the language or history of Rule 23 that gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action. Indeed, such a procedure contravenes the Rule by allowing a representative plaintiff to secure the benefits of a class action without first satisfying the requirements for it. He is thereby allowed to obtain a determination on the merits of the claims advanced on behalf of the class without any assurance that a class action may be maintained. * * * Additionally, we might note that a preliminary determination of the merits may result in substantial prejudice to a defendant, since of necessity it is not accompanied by the traditional rules and procedures applicable to civil trials. The court's tentative findings, made in the absence of established safeguards, may color the subsequent proceedings and place an unfair burden on the defendant." *Eisen v. Carlisle & Jacquelin, supra,* 417 U.S. at 177–178, 94 S.Ct. at 2152.

With this reading in mind, it is necessary to determine what constitutes going into the "merits" of a lawsuit.

In the instant case, the only support for plaintiff's allegations of class discrimination, after a year of discovery on the matter, are: (1) wholly conclusory allegations, essentially parroting the language of 42 U.S.C. § 2000e–2 in plaintiff's complaint and motions; (2) a four-and-a-half page affidavit of named plaintiff filed October 7, 1976, in which she conclusorily states: "I believe that all women and Asian employees, past, present and prospective and all applicants for employment have been * * discriminatorily treated"; and (3) statistics indicating that in defendant's work force

female and Asian employees are concentrated in lower-paying, lower-status (i.e., clerk as opposed to managerial) jobs.

In response to plaintiff's statistical showing, defendant filed statistics indicating that Citizens' percentages of women and Asians in the various salaried and status jobs were, in significant respects, entirely comparable to or more favorable than percentages in at least two relevant labor pools—the California Banking Industry Work Force and the California Work Force as a whole.[2]

In reply to this statistical showing by defendant, plaintiff argues two points. First, plaintiff contends that she "need not *prove* that Asians and females are discriminated against at the class certification stage". In other words, plaintiff claims that she has made a *prima facie* case for discrimination and that to consider defendant's statistical parries would constitute delving into the merits in violation of the *Eisen* rule.

Second, plaintiff argues that Citizens' demonstrations of parity in work force distribution by EEO–1 category do not rebut the *prima facie* case which plaintiff claims to have established. In this regard, plaintiff's contention is that defendant's showing does not exculpate Citizens but rather "raises an inference of discrimination against Asians and women by the banking industry in general". Plaintiff's first point goes to the proper *time* for considering the issue, while her second point goes to the proper *standards*. Reserving the first point, plaintiff is incorrect on the second. While a *prima facie* case of employment discrimination may be wholly based on statistics, the proper standard for measuring such a statistical showing *is* the relevant labor pool. The Ninth Circuit indicated its views on the matter in *United States v. Ironworkers Local 86,* 443 F.2d 544, 551 (9th Cir. 1971):

**2.** For example, plaintiff's statistics indicated that for 1974 Citizens' official/managerial work force was 34% female, its professional work force 29% female and its clerical work force 89% female. Defendant's statistics then indi-

cated that the figures for the California Banking Industry Work Force were 29.3%, 33% and 85% respectively, while the figures for the California Work Force as a whole were 15.6%, 23.9% and 80.5% respectively.

"Since the passage of the Civil Rights Act of 1964, the courts have frequently relied upon statistical evidence to prove a violation. This judicial practice has most often taken the form of the use of such data as a basis for allocating the burden of proof. On the basis that a showing of an absence or a small black union membership *in a demographic area containing a substantial number of black workers* raises an inference that the racial imbalance is the result of discrimination, the burden of going forward and the burden of persuasion is shifted to the accused, for such a showing is enough to establish a *prima facie* case." (Emphasis added.)

Recent academic authority is in accord:

" * * * The first step in traditional proof of discrimination is to determine a disparity between the minority group's representation *in a relevant population* and that group's representation in the particular position under scrutiny." *Beyond the Prima Facie Case in Employment Discrimination Law: Statistical Proof and Rebuttal,* 89 Harv.L.Rev. 387, 391 (1975). (Emphasis added.)

Final support is provided by the recent Supreme Court case of *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975):

"In *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158, this Court unanimously held that Title VII forbids the use of employment tests that are discriminatory in effect unless the employer meets 'the burden of showing that any given requirement [has] * * a manifest relation to the employment in question.' *Id.,* at 432, 91 S.Ct. at 854. This burden arises, of course, only after the complaining party or class has made out a *prima facie case of discrimination* —has shown that the tests in question select applicants for hire or promotion *in a racial pattern significantly different from that of the pool of applicants.* See *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668." (Emphasis added.)

Although *Albemarle* and *Ironworkers* are both cases going to the merits of a Title VII claim, both excerpts quoted deal with the establishment of a *prima facie* case. It seems clear that although Title VII plaintiffs are not required, for class certification purposes, to present *more* than a *prima facie* case of class discrimination, Title VII plaintiffs must, in the certification process, make some sort of *prima facie* class showing, particularly where reliance is placed *by plaintiff's choice* solely on statistics. *See, e.g., Rodriguez v. East Texas Motor Freight, supra,* 505 F.2d at 52. The difference is that a *prima facie* showing of class discrimination *ends* the certification process, yet merely begins the case on the merits. In either instance, however, the *prima facie* showing has meaning only in terms of the relevant labor or applicant pool, as *Albemarle* and *Ironworkers* indicate.

■ Now I turn to the question of whether the Court can *at this time* in the proceedings—during the class certification process—take cognizance of defendant's showing as to the relevant California labor pools. I conclude that it can.

■ Although the requirements of Rule 23 of the Federal Rules of Civil Procedure are to be liberally construed and although class actions are often appropriate in employment discrimination cases (*Wetzel v. Liberty Mutual Insurance Co.,* 508 F.2d 239 (3rd Cir. 1975); *Johnson v. Georgia Highway Express, Inc.,* 417 F.2d 1122 (5th Cir. 1969)), class actions are not automatic in Title VII suits and petitioners must meet the prerequisites of Rule 23. *Taylor v. Safeway Stores, Inc., supra; Kinsey v. Legg, Mason & Co., supra.*

■ In order to satisfy the Rule 23 requirement that there *be* a class, along with the Rule 23 requirement of typicality, the complaint on behalf of the class must be more than frivolous. *Mason v. Calgon Corp.,* 63 F.R.D. 98 (W.D.Pa.1974). Plaintiff must allege *facts* tending to show that defendants engaged in *class* discrimination if a class action is to be maintained. Bald assertions of widespread employment discrimination are not sufficient to satisfy the

class existence or typicality requirements of Rule 23 of the Federal Rules of Civil Procedure. *Taylor v. Safeway Stores, Inc., supra; Kinsey v. Legg, Mason & Co., supra. See also, Valentino v. Howlett*, 528 F.2d 975 (7th Cir. 1976). Thus, the Court must be able to review the sufficiency of class allegations as part of the certification determination.

Since bare-bone allegations are *not* sufficient, the Court must be able to take cognizance of whatever substance has been shown to adhere, relative, of course, *only* to plaintiff's *prima facie* case:

"In ruling on a class action a judge may consider reasonable inferences drawn from facts before him at that stage of the proceedings, and an appellate court will generally defer to the District Court's determination." *Senter v. General Motors Corp.*, 532 F.2d 511, 523 (6th Cir. 1976).

The Ninth Circuit has also indicated that at least some canvassing of the facts is permissible, even desirable, with respect to class action determinations:

"A class action determination under Fed.R.Civ.P. 23 is one of a trial court's considered discretion. As was stated in *City of New York v. International Pipe & Ceramics Corp.*, 410 F.2d 295, 298 (2d Cir. 1969), 'the judgment of the trial court should be given the greatest respect and the broadest discretion, particularly if * * * he has canvassed the factual aspects of the litigation.' This is so because the district court is in the best position to consider the most fair and efficient procedure for conducting any given litigation. Such a determination by the court will not be disturbed on appeal unless the party challenging it can show an abuse of discretion. *Wilcox v. Commerce Bank of Kansas City*, 474 F.2d 336 (10th Cir. 1973); *Castro v. Beecher*, 459 F.2d 725 (1st Cir. 1972); *Hackett v. General Host Corp.*, 455 F.2d 618 (3d Cir. 1972); *City of New York v. International Pipe & Ceramics Corp., supra.*" *Price v. Lucky Stores, Inc.*, 501 F.2d 1177, 1179 (9th Cir. 1974).

*See also, Clark v. Watchie*, 513 F.2d 994 (9th Cir. 1975).

In one of its most recent decisions, the Ninth Circuit ruled, with respect to class certification proceedings, that:

"The court is bound to take the substantive allegations of the complaint as true, thus necessarily making the class order speculative in the sense that the plaintiff may be altogether unable to prove his allegations. While the court may not put the plaintiff to preliminary proof of his claim, it does require sufficient information to form a reasonable judgment. Lacking that, the court may request the parties to supplement the pleadings with sufficient material to allow an informed judgment on each of the Rule's requirements." *Blackie v. Barrack*, 524 F.2d 891, 901, n.17 (9th Cir. 1975).

*Blackie* indicates that an extensive evidentiary showing on class certification is not required:

" * * * So long as [the trial judge] has sufficient material before him to determine the nature of the allegations and rule on compliance with the Rule's requirements, and he bases his ruling on that material, his approach cannot be faulted * * *." *Blackie v. Barrack, supra*, 524 F.2d at 901.

In this case, the Court cannot "take the substantive allegations of the [class] complaint as true" because there *is no* "substance" to those allegations—they are so conclusory as to be facially insufficient. In effect, were the Court to rely solely on the allegations of the complaint, it would be compelled to deny certification here for failure to allege a class claim in other than conclusory terms.

Realizing the paucity of the complaint allegations, plaintiff has *chosen* to carry her burden of satisfying the requirements of Rule 23 by making a statistical showing as to the existence of a class. Given this choice, it seems clear that the showing must amount to a *prima facie* case of class discrimination. *Rodriguez v. East Texas Motor Freight, supra*, 505 F.2d at 52. *Albe-*

marle Paper Co. v. Moody, supra, defines a prima facie case of class discrimination as including reference to relevant labor pools.

In effect, plaintiff has failed to meet her burden by proffering statistics not at all correlated to the standard which, by definition, is part and parcel of her prima facie case—the relevant labor pools. Merely because it is defendant that has supplied the necessary labor pool statistics should not bar the Court from considering them—such consideration does not constitute an inquiry into the "merits" of the case but merely, in the words of Blackie v. Barrack, supra, a review of "sufficient material * * * to determine the nature of the allegations" (524 F.2d at 901) and "to allow an informed judgment on each of the Rule's requirements" (524 F.2d at 901, n.17).

Surely, since plaintiff has chosen to satisfy the requirements of Rule 23 of the Federal Rules of Civil Procedure solely via statistics, defendant is permitted to, in effect, show the legal relevance of those statistics by placing them in the context required by the Supreme Court in Albemarle—that of the applicable labor pool.

A small disparity may be said to arise because Albemarle sets the measure of employment discrimination as the relevant applicant pool, while defendant's comparative bases here are the actual California Banking Industry Work Force and the California Work Force as a whole. Although, under different circumstances, there might be room for argument on this score, here the actual work force statistics proffered are highly probative of applicant levels, particularly since complete applicant statistics appear unavailable. More importantly, plaintiff has neither questioned, as to relevance or accuracy, nor offered rebuttal of defendant's work force statistics. Instead, in her reply brief, plaintiff chose to rest upon her initial statistical showing, uncorrelated to state labor pool data, as to the concentration of women and Asians at various levels of defendant's work force. At oral argu-

ment, plaintiff admitted that she had failed to correlate her statistics to relevant labor or applicant pools.

Had plaintiff rebutted or even substantively questioned defendant's work force statistics, further consideration of the issue might have resulted in an inquiry into the merits of the type precluded by Eisen v. Carlisle & Jacquelin, supra. However, defendant's unanswered statistics here merely highlight the fact that plaintiff has failed to make a prima facie statistical showing of class discrimination when plaintiff has apparently chosen to rest class certification entirely upon this vehicle. Defendant here has not rebutted or defended against plaintiff's attempted prima facie showing, but has merely proved why plaintiff's attempted showing falls far short of sufficiency. As such, this Court's consideration of defendant's argument and evidence does not constitute delving into the merits of this lawsuit. To hold otherwise would be to make class actions automatic in Title VII litigation.

■ In this case, plaintiff has been permitted to use the Rule 23 wedge during a year of class-oriented discovery—discovery aimed at facilitating plaintiff's proposed statistical showing as to the existence of a class. Viewed in this light, the insufficiency of plaintiff's showing is even more telling. See, e. g., Tolbert v. Western Electric Co., 56 F.R.D. 108 (N.D.Ga.1972). The concern of Eisen that class action procedures not be utilized until the existence of a class has been shown and the requirements of Rule 23 of the Federal Rules of Civil Procedure satisfied is heightened here. Plaintiff cannot use the class action as both a sword for discovery purposes and a shield against testing the sufficiency of allegations made as a result of that discovery. Plaintiff here has been given every advantage and has failed to satisfy Rule 23 of the Federal Rules of Civil Procedure; the rights of defendant must now be honored:[3]

3. This Court has been highly sympathetic to Title VII class actions in the past and has adopted the broad view of class certification.

See, e. g., Souza v. Scalone, 64 F.R.D. 654 (N.D.Cal.1974). However, due to the enormous expense of defending against class actions, and

" * * * The court cannot allow a class action where there is no class, even in a Title VII case, and it shares the concern of another court

'[T]hat a disgruntled employee who happens to be black may discover a weapon of revenge in the form of a major class action suit under Title VII, when the reason for that employee's discontent stems from causes other than race or sex discrimination. The opportunity for harassment of employers abounds regardless of the final outcome of the litigation. Moreover, if the employee lost the suit, he may be precluding other employees whom he included in the class from instituting legitimate claims in the future.' *Arey v. Providence Hospital, supra,* D.C., 55 F.R.D. 62, at 68." *Tolbert v. Western Electric Co., supra,* 56 F.R.D. at 114.

Other courts in this district have recognized the often fine line between fabricated and true class actions, at least as they appear during the early parts of a Title VII litigation:

"Irrespective of this district court authority to the contrary, the Courts of Appeal, the Congress and indeed the Supreme Court have all emphasized the importance of the broad remedial public policy of Title VII, and, in accordance with the majority of other courts, we conclude that the effectuation of this broad public policy requires that the commonality and typicality pre-requisites of Rule 23(a) be liberally applied in Title VII actions.

In so concluding, however, we do not hold that every Title VII action necessarily satisfies these two requirements. Where for example, as in *Hill v. American Airlines, Inc., supra* [5 Cir., 479 F.2d 1057], and *Gresham v. Ford Motor Co., supra* [D.C., 53 F.R.D. 105], a Title VII action is based upon the circumstances surrounding a particular course of disciplinary action taken against an employee

by an employer, or, as in *Wells v. Ramsey, Scarlett & Co., supra* [5 Cir., 506 F.2d 436], the plaintiff is unable to establish any real 'nexus' between the individual and the claims of the proposed class, class certification may be inappropriate for failure of the individual claim to meet the pre-requisites of commonality and typicality. Thus, even under the liberal majority rule, the pre-requisites of Rule 23(a) must be applied individually in each action.

In the instant action, we are unable to conclude that plaintiff's claims are primarily personal, and find her claims to be at least common to and typical of the identical claims of other former women employees." *Piva v. Xerox Corp.,* 70 F.R.D. 378, 387 (N.D.Cal.1975).

In the instant case, however, the line is hardly fine—that plaintiff's claim *is* "primarily personal" is evident not only from plaintiff's failure to make a *prima facie* showing as to the existence of a class, but also from the nature of the individual claim itself.

### B.

Rule 23(a)(4) of the Federal Rules of Civil Procedure requires that the court find, as a prerequisite to certification, that the named representative will fairly and adequately protect the interests of the class. It is well established that a court must carefully scrutinize the adequacy of representation in all class actions. *Rutledge v. Electric Hose & Rubber Co.,* 511 F.2d 668 (9th Cir. 1975).

Defendant here attacks plaintiff's ability to satisfy the adequacy requirement on three grounds: (1) the alleged conflict of interest of plaintiff's attorney who was with the Equal Employment Opportunity Commission (EEOC) during the pendency of this lawsuit there; (2) plaintiff's alleged "revenge" motive in bringing this suit; and (3) plaintiff's alleged refusal to bear the

due to the broad *res judicata* implications of class action judgments, plaintiffs must at some point become concrete in their class allegations—the line must be drawn somewhere. Although the Court does not now decide precisely

where, for all purposes, that "somewhere" may be, it can say with assurance that plaintiff's showings here are clearly on the insufficiency side of the line, the side which calls for denial of class certification.

ultimate costs of this litigation which are being advanced by plaintiff's attorneys.

## 1.

Treating these contentions *seriatim*, the parties agree that the relevant conflict of interest standard under these circumstances is set forth in *Gas-A-Tron of Arizona v. Union Oil Co. of California*, 534 F.2d 1322 (9th Cir. 1976).

In *Gas-A-Tron*, the Ninth Circuit ruled that the district court had exceeded its discretion in disqualifying an attorney on the ground that he had, while employed at another firm, access to confidential information concerning the defendant oil company. Although the attorney actually had worked, while employed with his previous firm, on *other* matters concerning the oil companies in question, the Court ruled that disqualification was inappropriate because the attorney:

> " * * * had not actually obtained any confidential information about either Shell or Exxon that would be relevant to the pending litigation, and he had not worked on matters that were 'substantially related' to the pending litigation." *Gas-A-Tron of Arizona v. Union Oil Co. of California, supra*, 534 F.2d at 1325.

In this regard, the Court noted that any initial inference of impropriety was dispelled by the fact that the attorney saw none of the files except those relating to the cases assigned him and heard no confidences from the lawyers with whom he associated.

■ In the instant case, plaintiff's attorney, Ms. Leavy, cannot be held to have a conflict of interest under *Gas-A-Tron* by virtue of her employment with the EEOC during the pendency of this case there. Any initial inference of impropriety has been adequately dispelled by Ms. Leavy's letter of June 21, 1976, which states, in effect, that she had no contact with plaintiff or her EEOC complaint prior to employment with her present firm. In fact, the letter goes on to indicate that at the EEOC Ms. Leavy worked in the litigation center some six floors removed from the district office which handled plaintiff's complaint and, thus, was not even in physical proximity to the information involved. These facts are not disputed by defendant.

There is also a potentially significant difference between the type and degree of conflicts generated by employment with a neutral public agency and the conflicts generated by employment with a rival private firm which has direct access to a client's most confidential information. EEOC attorneys who enter private practice often bear Title VII's most important cases before the courts. The judiciary must be careful not to restrict this resource based on imaginary conflicts of interest. However, the Court does not reach this issue because, in any case, Ms. Leavy is clearly not in violation of the *Gas-A-Tron* standards.

## 2.

Next, defendant claims that plaintiff is an inadequate representative of the class because she told a former co-worker, Phyllis Lee, that her purpose in bringing this suit was merely to get her supervisor, Allen Vickers, into court. This statement of plaintiff's is reported in an affidavit by Phyllis Lee.

■ The Court, in determining adequacy of representation, "must consider not only actual but also potential conflicts of interest which might arise between named plaintiff and her class during the course of the litigation." *Polak v. Noel Industries, Inc.*, 64 F.R.D. 333, 336 (S.D.N.Y.1974). The interests of the class must be closely identified with the interests of the representatives and the Court must be assured that the representatives will put up a real fight. *duPont v. Wyly*, 61 F.R.D. 615 (D.Del.1973).

■ Defendant contends here that plaintiff's professed "revenge" motive creates clear potential conflicts with the class because, in this frame of mind, plaintiff is likely to by-pass favorable settlement offers. The facts now before the Court, however, are insufficient to disqualify plaintiff on conflict-of-interest grounds. While the Court views the statements of plaintiff, as

reported by Lee, with concern, some vengeance is to be expected on the part of a litigant who feels she has lost her job due to racial and/or sexual discrimination. Indeed, the vengeance of an aggrieved person more often engenders the zealous prosecution essential to a class action than the *over-zealous* prosecution which may threaten to strangle a class action. More substantiated and more substantial allegations of ulterior motive were held insufficient to disqualify a plaintiff as class representative in *Polak*, for example.

In addition, Lee's affidavit is somewhat self-serving. When defendant made its decision to reorganize, Lee and not plaintiff was retained; in fact, Lee's retention is directly related to plaintiff's Title VII claims. Simply stated, the Court does not find, on the basis of Lee's affidavit, that potential conflicts of interest threaten to taint the class action with Lim as named plaintiff. To the contrary, it appears that plaintiff and her attorney *will* put up a "real fight".

### 3.

The most serious adequacy of representation claim urged by defendant goes to the manner in which this lawsuit is being financed by plaintiff. Defendant argues that plaintiff's attorneys are advancing the litigation costs and that plaintiff has refused to bear ultimate responsibility for those costs. Plaintiff answers that costs are being advanced by the attorneys and that "any other questions with respect to the financial arrangements between plaintiff and her attorneys are irrelevant for the purposes of class certification". At this point, Ms. Leavy has refused to give defendant any statement regarding the costs arrangement between plaintiff and her attorneys. Defendant's attorney, Mr. A. James Robertson, has filed an affidavit in which he states that Ms. Leavy informed him of "her understanding that Lim was not obligated to reimburse the [law] firm for costs advanced in the event the litigation was unsuccessful".

It is clear that Canon 5, Disciplinary Rule 5–103(B) of the Code of Professional Responsibility prohibits attorneys from advancing litigation costs *unless* the client remains ultimately responsible:

"While representing a client in connection with contemplated or pending litigation, a lawyer shall not advance or guarantee financial assistance to his client, except that a lawyer may advance or guarantee the expenses of litigation, including court costs, expenses of investigation, expenses of medical examination, and costs of obtaining and presenting evidence, provided the client remains ultimately liable for such expenses."

One of the most comprehensive cases on this issue is *Sayre v. Abraham Lincoln Federal Savings & Loan Association*, 65 F.R.D. 379 (E.D.Pa.1974), in which attorneys for plaintiffs, seeking to bring a class action against a number of banks and lending institutions, expressed their intention to advance all expenses of litigation, including costs of notifying the class, *with the understanding* that plaintiffs would reimburse counsel for all expenses should plaintiffs lose. The court held that under these circumstances questions concerning plaintiffs' financial status became irrelevant and plaintiffs would not be required to answer such questions in connection with the motion to certify the class.

*Here,* however, there is no indication that plaintiff is obligated to repay her attorneys; in fact, defendant has provided evidence to the contrary and plaintiff has chosen to remain silent on the matter. The *Sayre* court recognized that it might have come to a different result had there been indications that plaintiff did not feel obligated to repay her attorneys:

"Of course, were the questions concerning plaintiffs' understanding of their fee and costs arrangement to reveal a widespread expectation among plaintiffs that they were free from ultimate liability for funds advanced by counsel, or any other evidence that plaintiffs' counsel were maintaining this suit, then perhaps the extent of plaintiffs' assets would become

relevant as supportive evidence in determining whether plaintiffs' counsel were ethically adequate representatives of the class." *Sayre v. Abraham Lincoln Federal Savings & Loan Association, supra,* 65 F.R.D. 379, 385.

In fact, several cases indicate that, in determining adequacy of class representation, defendants may be entitled to discover the nature of a plaintiff's agreement with counsel concerning the payment of litigation expenses. *Stavrides v. Mellon National Bank & Trust Co.,* 60 F.R.D. 634 (W.D.Pa. 1973); *P.D.Q. Inc. of Miami v. Nissan Motor Corp.,* 61 F.R.D. 372 (S.D.Fla.1973).

Here, although defendant has requested such information several times, at least once by request for admissions, plaintiff has refused to inform defendant as to the nature of the fee arrangement, largely on grounds of alleged irrelevancy.

Were this case to proceed as a class action, the Court would be inclined to require plaintiff to answer defendant's questions concerning the fee arrangement in an effort to determine whether plaintiff understands and acknowledges her obligation to repay her attorneys' advancement of litigation costs. However, since the Court is denying class certification on the other grounds heretofore mentioned, and since at this time the Court knows nothing about the fee arrangement, adequacy of representation problems do not at this point amount to an independent ground for noncertification. Nevertheless, indications of possible ulterior motive and possible refusal to bear ultimate costs of class litigation reinforce the Court's conclusion that there is *in fact* no class and that, as a discretionary matter, no class ought to be certified here. The circumstances of this case regarding adequacy of representation bolster the Court's view that the lawsuit is "primarily personal" and not appropriate for class action.

In *Souza v. Scalone, supra,* 64 F.R.D. at 658, this Court opined with respect to the adequacy of representation requirement of Rule 23(a)(4) of the Federal Rules of Civil Procedure that "the examination of the coextensive nature of the representative's and the class' claims is really another way of examining the typicality of the claims". Here, plaintiff's failures to show existence of a class for typicality purposes are echoed in her problems regarding adequacy of representation.

Thus, after a year of class-oriented discovery, all the facts properly before the Court at this time lead me to conclude that there is no class here and that, therefore, this lawsuit may not continue as a class action.

### III.

Defendant's motion for summary judgment on plaintiff's individual claim of discrimination must be granted. The claim involves an allegedly discriminatory discharge in 1974 and an allegedly discriminatory nonpromotion in 1970.

### A.

Plaintiff's 1974 discharge can be analyzed as the result of four decisions by Citizens. First, in or around April, 1974, Allen Vickers, plaintiff's supervisor, decided to eliminate the two loan documentation auditor positions which were held by plaintiff and Phyllis Lee, a Caucasian. Second, soon thereafter Vickers decided to hire William Carmichael, a white male, rather than plaintiff for the newly-created position of Senior Internal Auditor. Third, Vickers decided to retain Lee rather than plaintiff to finish up the documentation auditing on certain files. Fourth, Citizens determined that there was no position available in another department to which plaintiff could be transferred.

The standard for judging individual claims of employment discrimination was set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1972). Initially:

"The complainant in a Title VII trial must carry the initial burden under the statute of establishing a prima facie case of racial discrimination. This may be done by showing (i) that [she] belongs to

a racial minority; (ii) that [she] applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite [her] qualifications [she] was rejected; and (iv) that, after [her] rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications."

Once plaintiff has established a *prima facie* case:

"The burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell Douglas Corp. v. Green, supra,* 411 U.S. at 802, 93 S.Ct. at 1824.

Finally, the complainant is entitled to a fair opportunity to prove that the employer's stated legitimate reasons were merely pretexts for racially discriminatory decisions.

Although the *McDonnell Douglas* standard was phrased in terms of hiring discrimination, that standard can be readily extrapolated to the instant situation of alleged discriminatory discharge.

Here, plaintiff's attempt to make a *prima facie* case consists of the allegations of the complaint and the four-and-one-half page conclusory affidavit of plaintiff, the gist of which is her statement that:

" * * * I believe that I was discriminatorily treated by Citizens with respect to compensation, training and promotional opportunities, discharge and leave of absence." Plaintiff's affidavit dated October 7, 1976, p. 2.

Defendant, on the other hand, has filed numerous affidavits, indicating legitimate, nondiscriminatory reasons for all of Citizens' actions. With respect to each of the four decisions outlined above, either plaintiff has failed to establish a *prima facie* case under the *McDonnell Douglas* standard or defendant has rebutted plaintiff's showing with such an overwhelming display of legitimate reasons for its decisions that "no genuine issue of material fact" as to discrimination remains. Fed.R.Civ.P. 56.

First, with respect to Citizens' decision to eliminate plaintiff's job classification, plaintiff's duties as loan documentation auditor were essentially to review and checklist the contents of each loan file. In 1973 Vickers discovered that competitor savings and loan associations were no longer utilizing employees to audit each loan file, but had instead instituted procedures to spot check only a small percentage of such files and examine certain accounting ratios for loans. Vickers also concluded that the process of auditing each loan file was not justified in that the cost of auditing the files was greater than any savings which resulted when the auditors discovered an error. Consequently, in about April, 1974, Vickers made the decision to eliminate the loan documentation auditor positions. On the record now before the Court, there is no genuine issue of material fact as to the legitimacy of this decision, grounded as it was in economic sense rather than personal or discriminatory design. Plaintiff has made no showing of discrimination here.

Second, with respect to Citizens' decision to hire Carmichael rather than plaintiff as the new Senior Auditor, plaintiff has made no showing that she was qualified for the position and, in addition, defendant has again amply legitimized its choice. The new position of Senior Auditor was created by Citizens not only to economize on plaintiff's job of file auditing but also to provide assistance for Vickers in his own work. Thus, besides taking over plaintiff's and Lee's work on a spot-check basis, Carmichael was hired to perform a broad range of auditing activities, including savings audits, branch security reviews, loan service department audits, and purchasing department audits. Whereas Carmichael was qualified to perform these types of audits, plaintiff does not dispute the fact that she was not so qualified. Moreover, it seems clear that additional tasks assigned to the new job classification of Senior Auditor required college level accounting courses and several years of experience. Carmichael had three years of college, whereas plaintiff had a high school education and an

inadequate knowledge of the necessary accounting. Whereas plaintiff's experience was in largely clerical positions, Carmichael had worked as controller for three different savings and loan associations from 1960 to 1972 and as an assistant controller for Security Pacific Bank from 1972 to 1974. Thus, plaintiff failed to make a *prima facie* showing of qualification for the new position. In addition, Citizens' own showing indicates that there is no genuine issue either as to plaintiff's lack of qualification or as to Carmichael's qualification for the job. Plaintiff argues, however, that even if she was not qualified to be Senior Auditor, Citizens could and should have trained her for the position. The Court finds no precedent for this argument and, indeed, plaintiff cites none. *McDonnell Douglas* requires proof of qualification, not mere allegation of ability to train for qualification.[4] Particularly where a plaintiff's qualifications fall as far short[5] as they do in this case, the *McDonnell Douglas* rule must be strictly adhered to:

> " \* \* \* Congress has not commanded that the less qualified be preferred over the better qualified simply because of minority origins. Far from disparaging job qualifications as such, Congress has made such qualifications the controlling factor, so that race, religion, nationality, and sex become irrelevant." *Griggs v. Duke Power Co.,* 401 U.S. 424, 436, 91 S.Ct. 849, 856, 28 L.Ed.2d 158 (1970).

■ Third, with respect to Citizens' decision to retain Lee rather than plaintiff to complete the documentation auditing and to liquidate the old job classification, plaintiff has made some showing of qualification but, ultimately, no showing of discrimination. At the time this decision was made, plaintiff was on a leave of absence for medical reasons and had been on a previous extended medical leave within the past year. Although plaintiff had been employed with Citizens four years longer than Lee, Lee had more experience as a loan documentation auditor and, in fact, had trained plaintiff in this work. Lee was at least slightly more efficient than plaintiff,[6] and was at least somewhat more willing to audit massive nationwide files. It was principally these nationwide files which needed auditing before the Senior Auditor was to take over. As to these facts there is no genuine dispute. In addition, according to Citizens' personnel evaluations, plaintiff was prone to absenteeism and was considered to lack initiative. Although plaintiff was qualified to audit the remaining files, Citizens' decision to retain Lee for this task was clearly supported by legitimate and nondiscriminatory reasons which plaintiff has failed to expose as pretext. Plaintiff goes on to contend that at the very least Lee *and* plaintiff should have shared the remaining work. However, Lee was at least somewhat more experienced, more efficient, more willing, and more available than the medically-absent plaintiff. This Court cannot scrutinize every possible business mechanism by which defendant might have reduced the impact on plaintiff of its legitimate, nondiscriminatory reorganization. On this record, there is no genuine issue of material fact that Citizens' *actual* decision to retain Lee but not plaintiff was

---

4. Although Title VII prohibits discrimination in the provision of opportunities for on-the-job training, the Act does not compel employers to train minority individuals for positions for which they are not qualified. Nor does plaintiff specifically contend she was *discriminatorily* denied on-the-job training. Citizens' statement that it offers all employees the opportunity to obtain further classroom training to advance themselves remains uncontroverted. Indeed, there is no evidence that plaintiff ever attempted to avail herself of this opportunity.

5. Vickers' affidavit indicates that, primarily due to deficiencies of education, initiative and experience, plaintiff was so underqualified for the new position of Senior Auditor that Citizens could not, with its resources, have trained her for the job. Plaintiff has produced no evidence to controvert this view.

6. Vickers conducted a study over a five-month period during 1973 and 1974 which indicated that Lee averaged .4 more audits per day than plaintiff. Whereas this is certainly not conclusive evidence of Lee's superiority in auditing loan files, it *is* evidence that Citizens conducted legitimate objective tests, the results of which support the employment decision made here.

legitimate and nondiscriminatory. Exploration of the roads not taken does not change the result here.

 Fourth, with respect to Citizens' determination that there were no available positions to which plaintiff could have been transferred, Vickers did recommend that plaintiff be transferred to a position in another department if such a position was open. Under Harry Sheehy, the Director of the Personnel Department, a search was made for a position in another department. Specifically, the search was carried out by Rufus Battles, a recruiter in the personnel department. Jacob Foster, Savings Manager at Citizens' main office, informed Battles that he was hesitant to take plaintiff into his department because first, he wanted someone sooner than plaintiff could start, and, second, plaintiff's salary was approximately $150 per month greater than the savings officer position. Previously, plaintiff had indicated to Battles that she would be interested in a savings officer position *if* the pay was about the same as her current job. Battles also made inquiries of Frank Rummonds, supervisor of the accounting department, regarding the possibility of transferring plaintiff into that department. Rummonds indicated that he was not particularly interested in having plaintiff work in his department, first, because she was a 9 a. m. to 5 p. m. employee (while his own employees apparently kept more flexible hours), and, second, because of her admitted absenteeism. Although Rummonds was willing to give plaintiff an accounting test, he was unwilling, for the reasons stated, to commit himself to employing her. Again, plaintiff has failed to fill out a *prima facie* case here. Under the standards of *McDonnell Douglas Corp. v. Green, supra,* plaintiff makes no specific showing that any positions were available to which she could have been or was willing to be transferred. In addition, plaintiff makes no specific showing that, after plaintiff's rejection for any such positions, the positions remained open and Citizens continued to seek applications from persons of plaintiff's qualifications. Again, Citizens' determination here is grounded in legiti-

mate, nondiscriminatory reasons. Plaintiff's sole argument is apparently that defendant should have tried harder to find an opening for her or to fit her into available openings. Specifically, plaintiff contends that Battles should have attempted to resolve Savings Manager Foster's hesitancies as to salary and starting time. In addition, plaintiff argues that Rummonds' hesitancies did not amount to an unequivocal refusal to hire plaintiff and that the accounting test should have been administered in a further attempt to accommodate plaintiff. Nevertheless, the Court is satisfied on these facts that Citizens' determination that no transfer position was available for plaintiff was legitimate and nondiscriminatory. Plaintiff's attacks on defendant's justifications for this determination hardly expose defendant's reasons as pretext. To the contrary, Citizens has adequately shown that what it did do was legitimate; plaintiff's speculations as to what defendant *might* have done in this case do not cast Citizens' *actual* determination in a different light.

On the basis of the foregoing discussion, the Court concludes that "no genuine issue of material fact" remains in this case and that defendant is entitled to summary judgment on the grounds that its discharge of plaintiff was nondiscriminatory when tested by the standards of *McDonnell Douglas.* Although plaintiff makes allegations and arguments which attempt to undermine defendant's legitimation of its decisions, plaintiff has still failed to raise a "genuine issue" in this regard because her claims and contentions are unsupported by specifics in the form of evidence or affidavit. In fact, plaintiff has made absolutely no affirmative showing of discrimination. At best, plaintiff, rather than prove her own case, has attempted to chip away at Citizens' strong defensive showing with conclusory allegations and hypotheses. Even these chips fall far short of a Title VII claim. Summary judgment is proper where, in a Title VII case, defendant's affidavits clearly indicating absence of discrimination remain substantially uncontroverted or are opposed solely by plaintiff's conclusory assertions. *Thompson v. Sun Oil Co.,* 523

F.2d 647 (8th Cir. 1975); *Patmon v. Van Dorn Co.*, 498 F.2d 544 (6th Cir. 1974).

### B.

■ Plaintiff's individual claim of discrimination is also based on an alleged incident of nonpromotion. Plaintiff contends that in January, 1970, she was transferred by Citizens to a lower status job on the promise that she would thereafter be promoted to Installment Loan Officer. Plaintiff alleges that because she was not so promoted and because a white male was instead hired as Installment Loan Officer, Citizens' actions in this regard violate Title VII. Defendant contends that plaintiff was transferred in January, 1970, because she *requested* the transfer and that Citizens *never* indicated to plaintiff that she would be promoted to Installment Loan Officer if she helped set up the Installment Loan Department. Thus, there appear to be disputes of material fact with regard to plaintiff's nonpromotion claim, although whether plaintiff's evidence on the matter suffices to raise the disputes to a "genuine issue" remains somewhat questionable. Yet even assuming, *arguendo,* plaintiff's version of the facts, plaintiff has still failed to make a *prima facie* case under *McDonnell Douglas* because she has made little or no showing that she was qualified to be promoted to Installment Loan Officer. Indeed, all indications are to the contrary. The white male ultimately hired as first Installment Loan Officer in June, 1970, had a college background and some nine years in the installment loan field as loan officer, assistant credit manager, and credit manager.

■ However, the Court need not decide whether there is a "genuine issue" as to the discriminatory nature of plaintiff's nonpromotion because the claim is clearly time-barred. The nonpromotion incident occurred in 1970, while plaintiff filed charges with the EEOC in about July, 1974, and filed this lawsuit for the first time in August, 1975. 42 U.S.C. § 2000e–5(d) requires that, as a prerequisite to commencement of a court action under Title VII, an aggrieved person must file charges of discrimination with the EEOC within at most 300 days of the alleged unlawful act of discrimination. Since plaintiff did not file timely charges with the EEOC, and since at this point plaintiff has no viable claim of "continuing violation", plaintiff's nonpromotion claim is barred. *Mather v. Western Air Lines, Inc.,* 59 F.R.D. 535 (C.D.Cal. 1973); *Hecht v. Cooperative for American Relief Everywhere, Inc.,* 351 F.Supp. 305 (S.D.N.Y.1973).

■ Plaintiff also purports to proceed in this case under 42 U.S.C. § 1981. It is clear that with respect to claims under Sections 1981 and 1983 the state three-year statute of limitations applies. Thus, assuming *arguendo* that plaintiff *has* a valid Section 1981 claim here, that claim is nevertheless time-barred because this action was not instituted within three years of the alleged 1970 incident of nonpromotion. *Mills v. Small,* 446 F.2d 249 (9th Cir. 1971).

The record before the Court clearly indicates that plaintiff has attempted to construct a Title VII claim, indeed a Title VII class action, out of a legitimate, nondiscriminatory discharge. Citizens has had to go a long way and has been put to great expense in defending this suit. Granting summary judgment against a Title VII plaintiff is far from a "summary" process. Given the potential subtlety of employment discrimination, this is as it should be. However, plaintiff has been given every opportunity to come forth with proof of her claims, and has failed to do so, as heretofore described. Now defendant is entitled to its judgment.

### ORDER

In accordance with the foregoing Opinion, plaintiff's motion to certify the class is denied, and defendant's motion for summary is granted.

Defendant shall prepare and lodge with the Court a judgment, approved as to form by plaintiff, by December 30, 1976.