**Marion GERLACH, and all persons similarly situated, Plaintiffs,**

v.

**ALLSTATE INSURANCE COMPANY, Defendant.**

**Civ. No. 70–1757.**

United States District Court,
S. D. Florida.

Feb. 17, 1972.

Irvine C. Spear Law Offices, Miami Beach, Fla., for plaintiffs.

Smathers & Thompson, Miami, Fla., for defendant.

## SUMMARY JUDGMENT
## FOR DEFENDANT

MEHRTENS, District Judge.

This is an action brought under the Truth in Lending Act (15 U.S.C. Sec.

1601 et seq.) by the plaintiff, Marion Gerlach, hereafter plaintiff, against the defendant, Allstate Insurance Company, hereafter Allstate, assertedly a "creditor" of plaintiff in a "consumer credit" transaction, to recover the $100 penalty and attorney's fees provided by 15 U.S.C. Sec. 1640(a) for failure to disclose information required by the Act in such a transaction.

Jurisdiction in this Court is specifically provided by 15 U.S.C. Sec. 1640(e).

Plaintiff also seeks to maintain this action as a class action on behalf of all others similarly situated.

All facts which the parties believe to be material to a determination of the merits of this action have been agreed to in the pretrial stipulation, which recites that there are no issues of fact to be tried, and that the parties do not believe a trial is necessary.

Plaintiff and Allstate each move for a summary judgment.

The agreed facts, insofar as they are material, are:

Plaintiff is a citizen and resident of Miami, Florida.

Allstate is an Illinois corporation engaged in a general lines insurance business, and is authorized to and is doing a general lines insurance business in Florida. The Florida business done by Allstate, insofar as the underwriting, collection of premiums and handling of claims is concerned, is completely managed and controlled out of Allstate's regional office in St. Petersburg, Florida, and is largely autonomous from Allstate's home office in Northbrook, Illinois. The administrative work in the handling of policies, notices, premiums, cancellations, etc., as far as possible, is accomplished by computers located at Allstate's St. Petersburg regional office. The Allstate agents who deal with the Florida insurance buying public, for the most part, are stationed in and operate out of the retail merchandising stores of Sears, Roebuck and Co. located throughout Florida.

The business which Allstate does in Florida is conducted in accordance with Florida's comprehensive laws regulating insurance (F.S. Insurance Code, Chs. 624–632, F.S.A.), under the supervision of the Insurance Commissioner of Florida.

One of Allstate's principal lines in Florida is automobile insurance.

On November 28, 1967 plaintiff executed an application for an Allstate automobile insurance policy. This Application contained, over plaintiff's signature, a number of declarations of fact concerning plaintiff and her automobile material to the issuance of automobile insurance coverage. It did not contain any agreement on plaintiff's part to pay premium for the insurance. Further, plaintiff has never executed any contract to pay premium.

The Allstate agent who prepared plaintiff's application for her signature explained to plaintiff that she had an election to pay premium under any one of the three following plans:

1. A full year's premium in one payment, payable at the time of the application.

2. In installment payments under either of the two following plans:

(a) 40% of a full year's premium payable at the time of application, 30% payable at the end of three months, and 30% at the end of six months.

(b) 10% of a full year's premium payable at the time of application, and 10% payable on the same day of the month each month thereafter until a total of ten such payments were made.

The agent further explained that a premium payment under one of these plans was required at the time he accepted the application and bound the coverage; further, that if she elected to pay in installments, there would be a flat service, or payment, charge (at that time $0.50) payable with each installment payment, which charge would be the same for each

installment payment, regardless of the number of such payments.

Plaintiff elected to pay premium in ten installments, paid the agent 10% of the annual premium and the service charge, the agent noted the payment in the application form, and bound Allstate to the coverage in the box provided in the application form for that purpose.

Thereafter, Allstate's regional office in St. Petersburg issued and delivered plaintiff's policy. The policy guarantees that it will be extended, or renewed by Allstate every year for five years, provided, in substance, that plaintiff makes the premium payments and does not lose her driver's license. The premium rate provided for on each annual renewal is to be the Allstate rate prevailing at the time of renewal.

The policy also provides for cancellation of the insurance coverage upon plaintiff's failure to pay premium, as well as cancellation by plaintiff at will.

Each November 29 since 1967 Allstate has issued to plaintiff a certificate for extension of insurance coverage under plaintiff's policy for an additional year at the premium rate then prevailing.

With each certificate of extension Allstate has issued to plaintiff a premium payment notice setting forth the then prevailing annual premium and giving plaintiff the same election as to premium payment plans, i. e., in one payment, in three payments or in ten payments, that she was given at the inception of the coverage. The amount of the payment under each of these plans is set forth, as well as the service charge, which is now $1.00 with each installment payment.

Plaintiff is still paying under the ten payment plan.

In addition to the premium notice issued with each annual extension certificate, in advance of the 29th of each month in which a premium payment is payable, Allstate has issued plaintiff a notice that the premium is payable on the 29th of the month, and of the amount of the payment and the amount of the service charge.

On occasion since November 29, 1967, plaintiff has failed to make a premium payment on time. Also on occasion, Allstate has issued to plaintiff a notice that unless the premium payment was made by a day certain, the insurance would terminate on that day. On each such occasion plaintiff has made the premium payment before the termination date. Plaintiff's policy is still in force.

Allstate has followed the same procedure with respect to the three plans of premium payment, and annual extension of insurance coverage for five years, with millions of Allstate automobile insurance policyholders throughout the United States, and many thousands of such policyholders in Dade County, Florida. In addition, the same three plans of premium payment are in effect for other lines of insurance coverage afforded by Allstate, such as homeowners insurance, and other types of coverage.

Each premium payment made under any of the installment plans pays for insurance coverage to a date beyond the time the next premium payment is due. When, under an installment plan of premium payment, a premium is not paid on a payment date, a computer calculates the date to which the last premium payment made paid for insurance coverage in advance, and, allowing at least the ten days' notice required by Florida law for cancellation for non-payment of premium (F.S. Sec. 627.0852(3) (a), F.S.A.), issues a notice to the policyholder that unless the premium payment is made by a date certain, i. e., either the end of the statutory ten days or the date to which coverage has been paid, whichever is later, the coverage is terminated. If payment is not made by such termination date, the policy is cancelled. In no event, regardless of the time or manner of cancellation, does Allstate seek to enforce, or make, any claim against the policyholder for premium earned, but not paid for.

Although Allstate clearly advises its policyholders of the dollar amount of the service charge collected with each premium installment payment, it makes no contention that it gives its policyholder all the items of information required by the Truth in Lending Act (15 U.S.C. Secs. 1638(a), 1639), and the regulations thereunder (Regulation Z, 12 C.F.R. Sec. 226.8(e) and (d)).

Under the pleadings and the agreed facts, the following legal issues are presented:

  I. WHETHER THIS ACTION SHOULD BE MAINTAINED AS A CLASS ACTION.

  II. WHETHER ALLSTATE'S PLANS OF INSTALLMENT PREMIUM PAYMENT CONSTITUTE A "CONSUMER CREDIT" TRANSACTION WITHIN THE MEANING OF 15 U.S.C. SEC 1640(a).

  III. WHETHER ALLSTATE IS A "CREDITOR" OF PLAINTIFF WITHIN THE MEANING OF THE TRUTH IN LENDING ACT.

  IV. WHETHER THE McCARRAN ACT PRECLUDES APPLICATION OF THE TRUTH IN LENDING ACT TO ALLSTATE'S INSURANCE PREMIUM TRANSACTIONS.

## I. CLASS ACTION

Plaintiff originally claimed the right to maintain this action as a class action on behalf of all others similarly situated nationwide. Allstate, in opposition, submitted affidavits that it has millions of policyholders who have elected to make payment of premiums in installments under plans identical with that offered to plaintiff. Plaintiff thereafter indicated that she would prefer to maintain this action as a class action on behalf only of those Allstate automobile policyholders within Dade County, Florida. This would still involve some 50,000 policyholders to whom, since their identity is ascertainable from Allstate files at its regional office in St. Petersburg, Florida, at least first class mail notice would be required as to each member of the class.

In addition, the identification of such policyholder, requiring as it would a special computer programming and run, would entail a substantial expense running into several thousands of dollars. Plaintiff has not indicated a willingness to bear this expense.

■ The maintenance of this action as a class action on the basis asserted in the complaint, even if restricted to Dade County, Florida, would result in insurmountable problems in the management of the action, among which are (1) the creation of a class so large as to be unmanageable, (2) an enormous expense with respect to notice as well as administration of the action as a class action, and (3) a potential result, if plaintiff's position were sustained, of rendering Allstate unable to meet its commitments to provide insurance coverage to its policyholders, since the imposition of the $100 penalty with respect to each policyholder would run into approximately a billion dollars and as a consequence plaintiff's position is adverse to those policyholders who would prefer insurance coverage to the $100 penalty and risk of loss of coverage. Further, since Truth in Lending provides an attorney's fee for a successful claimant to the Section 1640 (a) penalty, there is not the reason for class maintenance of claims for all sums of money in Truth in Lending actions that exist in actions for which no attorney's fees are provided by law. The Court, therefore, concludes that on the basis of subparts (A), (B), (C) and (D) of Rule 23(b) (3) and the considerations mentioned in the notes of the Advisory Committee which drafted the Rule, the maintenance of a class action in this case is not appropriate. For further reasons, and a more detailed explanation, the Court adopts the opinion in Buford v. American Finance Co. (N.D.Ga.1971), 333 F.Supp. 1243, insofar as it relates to maintenance of actions for the penalty provided in Truth in Lending.

II and III. ALLSTATE'S PLANS OF INSTALLMENT PREMIUM PLAN DO NOT CONSTITUTE A "CONSUMER CREDIT" TRANSACTION, AND ALLSTATE IS NOT A "CREDITOR" OF PLAINTIFF WITHIN THE MEANING OF THE ACT

The provisions of 15 U.S.C. Sec. 1640 (a), so far as material and in substance, are that any "creditor" who fails in connection with any "consumer credit transaction" to disclose required information is liable to the debtor for a penalty of $100 and a reasonable attorney's fee.

The information required to be disclosed in a consumer credit transaction is itemized in the Truth in Lending Act (15 U.S.C. Secs. 1637 (open end credit), 1638 (credit sales other than open end credit), and 1639 (loans other than open end credit)), and in Regulation Z promulgated by the Federal Reserve Board pursuant to that Act (12 C.F.R. Secs. 226.7 (disclosures, open end credit) and 226.8 (disclosures other than open end credit)).

■ Allstate does not contend that it gives its policyholders the information required to be given by a creditor in a consumer credit transaction. It does contend that it is not a "creditor", and that its installment premium payment plans are not "consumer credit" transactions. As the Court noted in Mourning v. Family Publications Service, Inc., 5 Cir. (1971), 449 F.2d 235, 240, it is essential to the applicability of Sec. 1640 (a) that there be both a "creditor" and a "consumer credit" transaction.

No Allstate insured is obligated by any agreement to make any premium payment. At the inception of every policy for which the insured policyholder elects to pay premium in installments, Allstate collects a premium payment; either 40% of a year's premium, or 10% of a year's premium. Whichever of the alternatives it may be, the payment pays for insurance coverage for a period of time that extends beyond the next installment premium payment date. Not only is this stipulated as a fact—it is obvious from the fact that under the three-payment plan,

the full year's premium has been paid at the end of six months, and under the ten-payment plan it is paid at the end of nine months and one day. If the insured fails to pay on a payment date, he is notified that unless he pays by a date certain his insurance is terminated. The last mentioned date is the date to which he has already paid for insurance coverage in advance, unless the statutory ten days' notice requirement sets the termination date beyond the date for which coverage has already been paid, in which latter event the termination date is at the end of the statutory ten days. But regardless of the time of cancellation by Allstate's notice, Allstate neither seeks to enforce nor makes any claim against the insured for any earned premium for insurance coverage provided by Allstate and not paid for by the insured. In short, if the policy is cancelled there is no further obligation on the part of the insured.

■ Thus, within the meaning of Sec. 1640(a) and the definitions set forth in 15 U.S.C. Sec. 1602 as well as in Regulation Z, 12 C.F.R. Sec. 226.2, the policyholder is not a debtor of Allstate, Allstate is never in the position of being a "creditor" of the insured, there is no "credit", and there is no "consumer credit";—not as the quoted terms are defined and used in the Act, or in Regulation Z, and not as any of the foregoing terms have any commonly accepted meaning.

The transaction in this action is not to be confused with the premium financing transaction, where the insured becomes obligated to a broker, bank, the issuing company or other creditor to pay the premium, or an indebtedness for premiums, and is contractually obligated to make payments, such as was involved in Stefanski v. Mainway Budget Plan, Inc., (S.D.Fla.1971), 326 F.Supp. 138. There, of course, the creditor-debtor relationship comes into existence between the insured and the party he is obligated to pay. In the present transaction the insured is under no obligation to pay any amount of premium. If he doesn't make the first payment at the time of applica-

tion, of course, no insurance coverage comes into existence. If he does not make the next payment the coverage ends when that for which he has paid runs out. He is not bound by any obligation to pay anything.

Considering only the definitions of "creditor" and "consumer credit" in 15 U.S.C. Sec. 1602 and Regulation Z, the present transaction is outside the scope of the Truth in Lending Act.

There are as yet few decisions on Truth in Lending.[1] None of them involve the precise issue presented here. Only *Stefanski,* above, even involves insurance. None involves the issue of whether there was a debtor, a "creditor", or a "consumer credit" transaction.

The only Truth in Lending interpretations that go to the present problem are the correspondence releases by the Federal Reserve Board. These releases have several times held, with respect to insurance premium payment plans under which a policyholder can elect to pay the premium in installments, and is charged a service charge for installment payment, that:

"These types of plans, in which the customer is not obligated to make re-maining payments, but may elect to cancel at any time by simply not paying an installment when due, would not create the creditor-debtor relationship required before a transaction becomes subject to Regulation Z."

These releases are published in the CCH Consumer Credit Guide, Volume 4, in paragraphs 30,041, 30,051, 30,176, and 30,406. In these releases the Board has made a clear distinction between the situation where the insured is not obligated to make remaining payments, on the one hand, and the transaction of premium financing under which the insured becomes contractually obligated to pay the premium, or to pay an indebtedness for premium, on the other.

Allstate's transaction involved in this action is clearly one falling within the above quoted language of the Board's releases, and does not create the creditor-debtor relationship required for the transaction to become subject to Truth in Lending.

This Court noted in *Stefanski,* at 326 F.Supp. 142, the persuasive, though not binding, authority of the Federal Reserve Board's correspondence releases. In the present situation the Fed-

---

1. The West Reporter System reported decisions, in chronological order: Ratner v. Chemical Bank New York Trust Co., S.D.N.Y. (1970), 309 F.Supp. 983 (open end consumer credit; on motion to stay, on primary jurisdiction grounds, pending decision of Fed.Res.Bd.), 329 F.Supp. 270 (on the merits on plaintiff's motion for summary judgment; good faith error of law as "unintentional violation" under Sec. 1640(c)); Continental Oil Co. v. Burns, D.C.Del. (1970), 317 F.Supp. 194 (credit card plan; declaratory judgment action); Bostwick v. Cohen, N.D.Ohio (1970), 319 F.Supp. 875 (rescinded contract for payment for construction of swimming pool); Stefanski v. Mainway Budget Plan, Inc., S.D.Fla. (1971), 326 F.Supp. 138 (insurance premium finance contract; whether a "credit sale", or a "loan"); Sapenter v. Dreyco, Inc., E.D. La. (1971), 326 F.Supp. 871 (application of exemption of commercial credit extension to mortgage on income real property privately owned); Strompolos v. Premium Readers Service, N.D.Ill. (1971), 326 F.Supp. 1100 (application of "four installment" regulation to magazine pur-chase contract); Jordan v. Montgomery Ward & Co., 8 Cir. (1971), 442 F.2d 78, rev'g 317 F.Supp. 948 (application of Sec. 1640(a) penalty to violation of credit advertising provisions in Truth in Lending); Katz v. Carte Blanche Corp., W.D. Pa. (1971), 52 F.R.D. 510 (credit card transaction; on whether action maintainable as a class action); Garza v. Chicago Health Clubs, Inc., N.D.Ill. (1971), 329 F.Supp. 936 (retail installment contract; on motions to dismiss and for more definite statement); Rogers v. Coburn Finance Corp., N.D.Ga. (1971), 53 F.R.D. 182 (loan transaction; on whether action maintainable as class action); Mourning v. Family Publications Service, Inc., 5 Cir. (1971), 449 F.2d 235 (validity of "four installment" regulation with respect to magazine purchase contract); Buford v. American Finance Co., N.D. Ga. (1971), 333 F.Supp. 1243 (small loan transactions; good faith error of law as "unintentional violation" under Sec. 1640(c); class action not maintainable where plaintiff unable to pay for first class mail notice).

eral Reserve Board's correspondence releases are compatible with reason, and compatible not only with the definitions of "creditor" and "consumer credit transaction" as found in the Act, but also with the commonly accepted understanding of the meaning of creditor, debtor, and creditor-debtor transactions.

Allstate is not a creditor of the plaintiff, nor of any of its policyholders; the transaction in question in this case is not a consumer credit transaction, and is not subject to the provisions of the Truth in Lending Act, and summary judgment should be and hereby is granted to Allstate.

## IV. THE McCARRAN ACT

In view of the Court's finding that Allstate is not a "creditor" of plaintiff in a "consumer credit" transaction, a discussion of the McCarran Act and its application would not now be necessary for the determination of this suit. It will be discussed, however, in the event that the appellate court should find, contrary to this Court's holding, that Allstate's plan of installment premium payment is not part of its rate structure but is a "premium financing" arrangement, or in the event that the Court of Appeals' holding in Mourning v. Family Publications Service, Inc. should be reversed by the Supreme Court.

The material portion of the Act of Congress commonly referred to as the McCarran Act, and sometimes the McCarran-Ferguson Act, provides, in 15 U.S.C. Sec. 1012(b):

"No Act of Congress shall be construed to invalidate, impair or supersede any law enacted by any state for the purpose of regulating the business of insurance * * * unless such Act specifically relates to the business of insurance * * *"

The basic question involved in McCarran Act cases has been thus put in Hamilton Life Ins. Co. of New York v. Republic National Life Ins. Co., S.D.N.Y. (1968), 291 F.Supp. 225 (aff'd. 2 Cir., 408 F.2d 606) at p. 230:

"The primary issue to be resolved may be broadly formulated in these terms: to what extent does the McCarran-Ferguson Act limit the operation of federal statutes * * * that do not by their terms specifically apply to the business of insurance?";

and on p. 231:

"Next to be considered is the question of whether there is any State law enacted for the purpose of regulating insurance which would be invalidated, impaired or superseded if the Federal * * * Act is applied * * *."

As to the first of the above-quoted questions, the recent expression of the Supreme Court in Securities & Exchange Commission v. National Securities, Inc., (1969), 393 U.S. 453, 89 S.Ct. 564, 21 L. Ed.2d 668, is helpful. There, in reviewing the history of the McCarran Act, and distinguishing between insurance regulation and securities regulation, the Court, at 393 U.S. 459, 89 S.Ct. 568, said:

"Insurance companies may do many things which are subject to paramount federal regulations; only when they are engaged in the 'business of insurance' does the statute apply. Certainly the fixing of rates is part of this business; * * * The selling and advertising of policies, * * * are also within the scope of the statute. * * * But whatever the exact scope of the statutory term, it is clear where the focus was—it was on the relationship between the insurance company and the policyholder. Statutes aimed at protecting or regulating this relationship, directly or indirectly are laws regulating the 'business of insurance.'"

In the instant case, there exists a Federal statute, the Truth in Lending Act, which does not "specifically relate to the business of insurance".

As the Supreme Court has made clear, the fixing of rates is a part of the "business of insurance". The next question then, is whether there is state law regulating the fixing of insurance rates. The answer is in the affirmative. Long

before the inception of plaintiff's policy in 1967, F.S. Secs. 627.011–627.391, F.S.A., constituted a comprehensive scheme for the fixing of insurance rates. Although the rate regulatory scheme has undergone changes since 1967, Florida continues to exercise its control over the fixing of insurance rates.

As the court said in California League of Independent Ins. Producers v. Aetna Cas. & Sur. Co., N.D.Cal. (1959), 175 F.Supp. 857, 860:

> " * * * a State regulates the business of insurance within the meaning of Section 1012(b) when a State statute generally proscribes * * * or permits or authorizes certain conduct on the part of the insurance companies * * * it would seem to follow that if a State has generally authorized or permitted certain standards of conduct, it is regulating the business of insurance under the McCarran Act. * * * from what has been said it is apparent that the defendants are alleged to have violated the Sherman Act in matters generally authorized or permitted by the State of California. Plaintiffs' remedy is under State, not federal, law * * *."

What Allstate is doing with respect to its premium payment plans and service charge, as a part of its rate structure, is authorized, or permitted by the laws of Florida. Thus, even if Truth in Lending were considered otherwise applicable to such a transaction, to apply Truth in Lending to the transaction, and require more than is required under Florida law, would impair or supersede the Florida regulation of the matter.

The foregoing, however, is not the end of the matter. Florida law, as a part of the Florida Insurance Code, regulates insurance premium finance companies and premium financing (Secs. 627.0990–627.-1023), and specifically sets forth, in Sec. 627.1003(3) (b), what disclosures are required in a premium financing agreement. Thus, although Allstate's transaction is not premium financing, this Florida regulatory legislation on the same

subject as Truth in Lending, namely, disclosure, would have precluded applicability of Truth in Lending in insurance premium consumer credit transactions in Florida. It is immaterial that the regulation is not the same. What is controlling is that the regulation exists. As pointed out in Transnational Insurance Co. v. Rosenlund, D.C.Or. (1966), 261 F. Supp. 12, 26:

> "A verbatim duplication of the Federal legislation * * * is not required. * * * Where there is an applicable state statute the federal legislation does not apply."

In American Hospital & Life Ins. Co. v. Federal Trade Commission, 5 Cir. (1957), 243 F.2d 719, a Federal Trade Commission cease and desist order, based on a charge of unfair and deceptive advertising practices in violation of the Federal Trade Commission Act, was set aside on the ground that, in each of the states in which the insurer was doing business and to which the order applied, there was a state statute regulating deceptive and misleading advertising, thereby bringing the McCarran Act into play and precluding Federal Trade Commission jurisdiction in the matter. On further review, the Supreme Court, sub nom. Federal Trade Commission v. National Casualty Co., (1958), 357 U.S. 560, 78 S.Ct. 1260, 2 L.Ed.2d 1540 affirmed, holding that the McCarran Act had withdrawn from the Federal Trade Commission the authority to regulate insurance companies' advertising practices in those states which were regulating those practices under their own laws.

In conclusion, the Court finds that Allstate is not a "creditor" of plaintiff; plaintiff is not a debtor of Allstate; and the transaction between plaintiff and Allstate for the payment of insurance premiums in installments with a service charge for each installment payment is not a "consumer credit" transaction within the meaning of the Truth in Lending Act.

The Court further finds that the Florida statutory regulation of premium

financing and the McCarran Act preclude application of the Truth in Lending Act to those Florida premium insurance transactions to which the Act might otherwise be applicable.

It is therefore

Ordered and adjudged that this action be and the same hereby is dismissed at plaintiff's costs.