Doreen M. COCHRAN,
Plaintiff-Appellant,

v.

PACO, INC., Defendant-Appellee.

Clara M. JONES, Plaintiff-Appellant,

v.

PACO, INC., Defendant-Appellee.

Nos. 76–1956, 76–2675.

United States Court of Appeals,
Fifth Circuit.

Jan. 2, 1979.

Joseph H. King, Jr., Atlanta, Ga., for Doreen M. Cochran.

Jeraud C. Kluckman, Asst. Director, Bd. of Governors of the Federal Reserve System, Washington, D. C., for amicus curiae Bd. of Governors of the Federal Reserve System.

Joseph H. King, Jr., Graydon W. Florence, Jr., Atlanta, Ga., for Clara M. Jones.

Jerry B. Blackstock, Robert L. Connelly, Jr., Atlanta, Ga., for Paco, Inc.

Before BROWN, Chief Judge, THORNBERRY and MORGAN, Circuit Judges.

THORNBERRY, Circuit Judge:

These consolidated cases, along with two others also decided this day,[1] require us to examine the relationship between the McCarran-Ferguson Act ("McCarran Act"), 15 U.S.C. §§ 1011 et seq., and the Truth in Lending Act ("TIL"), 15 U.S.C. §§ 1601 et seq. Here we must decide whether the McCarran Act precludes application of TIL's disclosure requirements to a credit agreement between a lending institution and a borrower who had obtained the loan to purchase automobile insurance.

The district court, faced with the borrower's suit alleging violations of TIL, held that the lender was engaged in the business of insurance within the meaning of the McCarran Act and entered summary judgment in favor of the lender. For the reasons stated below, we reverse.

## I. FACTUAL BACKGROUND

Paco, Inc. is a premium finance company licensed by the Georgia Insurance Commissioner under the state's Insurance Premium Finance Company Act, Ga. Code Ann. §§ 84–5301 et seq. In March 1975, Doreen Cochran entered into a contract with Paco whereby Paco agreed to finance the premiums on an automobile insurance policy that Cochran purchased from Cotton States Mutual Insurance Company. This premium financing agreement contained disclosures[2] mandated by Georgia law, as well as others that are permissible but not required.[3] Paco took a security interest in the policy and was granted a power of attorney, enabling it to cancel the insurance if the installment payments were not made. See Ga. Code Ann. § 84–5312(a). When Cochran defaulted, Paco cancelled the policy.

Cochran brought this action, alleging that Paco had violated the disclosure requirements of TIL and Regulation Z, 12 C.F.R. § 226.[4] Paco moved to dismiss on the basis

---

1. *Perry v. Fidelity Union Life Ins. Co.*, 606 F.2d 468 (5 Cir. 1978); *Cody v. Community Loan Corp.*, 606 F.2d 499 (5 Cir. 1978).

2. The following information was disclosed:

| | |
|---|---|
| Cash price (total premiums) | $151.00 |
| Cash down payment | $ 53.00 |
| Unpaid balance (amount financed) | $ 98.00 |
| Finance charge | $ 14.28 |
| Total of pmts. | $112.28 |
| Annual percentage rate | 67.96% |
| Deferred payment price | $165.28 |
| No. pmts. | 4 |
| Amount each payment | $ 28.07 |
| Date first payment due | 4–12–75 |

Record at 58.

3. Under Ga. Code Ann. § 84–5309, a premium financing agreement must contain the total premiums, the amount of the down payment, the principal balance, the amount of the service charge, the balance payable by the insured, the number of payments required, the amount of each payment in dollars, and the due date. The statute specifically provides that "additional items may be included," and here the agreement showed the "annual percentage rate."

4. Specifically, Cochran alleged that Paco failed to: (1) disclose, using the appropriate term, the "unpaid balance of cash price," in violation of 12 C.F.R. § 226.8(c)(3); (2) disclose, using the appropriate term, the "total down payment," in violation of § 226.8(c)(2); (3) make the required disclosures clearly and in meaningful sequence, in violation of § 226.6(a); (4) print

of the McCarran Act and later moved for summary judgment. The case was referred to a special master, who recommended that Paco's motion be denied. However, the district judge rejected that recommendation and entered summary judgment in favor of Paco, holding that the lender was engaged in the business of insurance which is regulated by the State of Georgia and that application of TIL to the premium financing agreement would supersede Georgia law, in contravention of the McCarran Act. Cochran's subsequent motion to alter or amend this decision was denied. *Cochran v. Paco, Inc.*, 409 F.Supp. 219 (N.D.Ga.1976).

On the basis of this decision, Paco's motion to dismiss was granted in a similar case, *Jones v. Paco, Inc.*, No. C76–90A (N.D. GA., May 5, 1976). Appeals were taken in both cases, which were then consolidated. Because the facts in *Jones* are substantially the same as those in *Cochran*, we will not recite them. The legal issues in the two cases are identical.[5]

## II. THE McCARRAN–FERGUSON ACT

These cases call into play the first two sections of the Act, 15 U.S.C. §§ 1011 & 1012, which provide as follows:

§ 1011. Declaration of policy

Congress declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States.

§ 1012. Regulation by State law; Federal law relating specifically to insurance; applicability of certain Federal laws after June 30, 1948

(a) The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business.

(b) No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance; *Provided,* That after June 30, 1948, the Act of July 2, 1890, as amended, known as the Sherman Act, and the Act of October 15, 1914, as amended known as the Clayton Act, and the Act of September 26, 1914, known as the Federal Trade Commission Act, as amended, shall be applicable to the business of insurance to the extent that such business is not regulated by State law.

The legal climate surrounding the Act's passage was neatly summarized by Justice Marshall in *Securities & Exchange Comm'n v. National Securities, Inc.*, 393 U.S. 453, 458, 89 S.Ct. 564, 567–68, 21 L.Ed.2d 668 (1969):

[The Act] was passed in reaction to this Court's decision in *United States v. South-Eastern Underwriters Assn.*, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944). Prior to that decision, it had been assumed, in the language of the leading case, that "[i]ssuing a policy of insurance is not a transaction of commerce." *Paul v. Virginia*, 8 Wall. 168, 183, 19 L.Ed. 357 (1869). Consequently, regulation of insurance transactions was thought to rest exclusively with the States. In *South-Eastern Underwriters*, this Court held

---

the term "finance charge" more conspicuously than other terminology, in violation of § 226.-6(a); (5) disclose adequately default charges payable in the event of late payments in violation of § 226.8(b)(4); (6) adequately disclose the security interest it purports to hold, in violation of § 226.8(b)(5); (7) disclose the "total of payments," using that term, in violation of § 226.8(b)(3); (8) identify the method of computing any unearned portion of the finance charge in the event of prepayment, in violation

of § 226.8(b)(7); and (9) furnish a duplicate of the disclosure statement at the time disclosures were made, in violation of § 226.8(a).

Record at 42, 72–73.

5. The Board of Governors of the Federal Reserve System, charged with the responsibility of prescribing regulations for the implementation of TIL, has filed an *amicus curiae* brief in *Cochran* urging reversal of the district court's decision.

that insurance transactions were subject to federal regulation under the Commerce Clause, and that the antitrust laws in particular, were applicable to them. Congress reacted quickly. Even before the opinion was announced, the House had passed a bill exempting the insurance industry from the antitrust laws. 90 Cong.Rec. 6565 (1944). Objection in the Senate killed the bill, 90 Cong.Rec. 8054 (1944), but Congress clearly remained concerned about the inroads the Court's decision might make on the tradition of state regulation of insurance. The McCarran-Ferguson Act was the product of this concern. Its purpose was stated quite clearly in its first section; Congress declared that "the continued regulation and taxation by the several States of the business of insurance is in the public interest." 59 Stat. 33 (1945), 15 U.S.C. § 1011. As this Court said shortly afterward, "[o]bviously Congress' purpose was broadly to give support to the existing and future state systems for regulating and taxing the business of insurance." *Prudential Insurance Co. v. Benjamin*, 328 U.S. 408, 429, 66 S.Ct. 1142, 90 L.Ed. 1342 (1946).

■ Congress thus returned to the states the plenary power to regulate the business of insurance that they had enjoyed prior to the *South-Eastern Underwriters* decision.[6] If Congress intended to invoke its Commerce Clause powers to occupy part of the field of insurance regulation, it would expressly say so. Congress wanted to ensure that no future federal legislation enacted under the Commerce Clause and not specifi-

cally related to insurance would be construed as an implied repeal of the McCarran Act. 15 U.S.C. § 1012(b).[7]

■ Finally, although the Act was passed primarily in response to *South-Eastern Underwriters*, an antitrust case, there is no doubt that its scope is much broader than the antitrust area. For example, state tax laws relating to the business of insurance are expressly covered by 15 U.S.C. §§ 1011 & 1012. In addition, these two sections speak of "regulation" of the insurance business, and that term is certainly not limited to antitrust regulation. Although debate naturally focused for the most part on the Act's antitrust implications,[8] Congress was clearly concerned with the overall regulatory picture, including "collection of premiums, general regulations, the issuing of licenses, and many other aspects of the business." 91 Cong.Rec. 481–82 (1945) (remarks of Senator Radcliffe).[9] Moreover, 15 U.S.C. § 1014 makes the National Labor Relations Act and the Fair Labor Standards Act specifically applicable to the business of insurance, also demonstrating Congress' intent to leave the states free to regulate insurance in areas having no relationship to antitrust.

Not surprisingly, the bulk of McCarran Act jurisprudence involves the Act's application in the antitrust context. While the antitrust cases are not dispositive of the issues presented in the instant cases, they do serve as useful guides for construing the terms of the statute, and where appropriate we shall feel free to borrow prior constructions of the Act's language from the antitrust cases.

---

6. This power was understood to be constitutionally limited by the states' inability to regulate outside their borders. *See FTC v. National Cas. Co.*, 357 U.S. 560, 78 S.Ct. 1260, 2 L.Ed.2d 1540 (1958); 91 Cong.Rec. 487 (1945) (remarks of Senator Ellender).

7. Senator Ferguson stated:
   If there is on the books of the United States a legislative act which relates to interstate commerce, if the act does not specifically relate to insurance, it would not apply at the present time. Having passed the bill now before the Senate, if Congress should tomorrow pass a law relating to interstate commerce, and should not specifically apply the

law to the business of insurance, it would not be an implied repeal of this bill, and this bill would not be affected, because the Congress had not . . . said that the new law specifically applied to insurance.
91 Cong.Rec. 481 (1945). *See also id.* at 1487 (remarks of Senator Ferguson); *Prudential Ins. Co. v. Benjamin, supra*, 328 U.S. at 429–30, 66 S.Ct. 1142.

8. *See* 91 Cong.Rec. 1442–44, 1477–89 (1945).

9. *See also* 91 Cong.Rec. 483 (remarks of Senators Radcliffe and Ferguson); 1480 (remarks of Senator Pepper).

## III. DISCUSSION

The initial question is whether TIL "specifically relates to the business of insurance" within the meaning of 15 U.S.C. § 1012(b). If it does, the McCarran Act defense is automatically defeated and our inquiry is at an end. If it does not, then we must decide whether Paco's premium financing activities, carried out in connection with Cochran's purchase of an insurance policy from another company, constitute the "business of insurance" for purposes of § 1012(b). If those activities are not a part of the business of insurance, TIL would apply. If they are a part of such business, we must then determine whether Georgia has "enacted by any [law] . . . for the purpose of regulating" such activities. If the state has not done so, TIL would apply. If it has, we must finally decide whether TIL would "invalidate, impair, or supersede" such state law. *See SEC v. National Securities, Inc., supra*; *Lowe v. Aarco-American, Inc.*, 536 F.2d 1160 (7 Cir. 1976); *Gerlach v. Allstate Ins. Co.*, 338 F.Supp. 642 (S.D.Fla.1972); *Krischer, "Truth" in Insurance Premium Financing*, 30 Bus.Lawyer 969 (1975).

### A. "Specifically Relates"

■ Nowhere in TIL is there a provision that specifically relates the legislation to the business of insurance. In contrast, the McCarran Act itself contains a section that "specifically relates" the National Labor Relations Act and the Fair Labor Standards Act to the business of insurance. 15 U.S.C. § 1014.[10] Moreover, TIL contains no other indication that we should construe it as an implied repeal of the McCarran Act, even if we were so inclined as to ignore the Act's legislative history and judicially recognize such an implied repeal. *See* footnote 7, *supra*, & accompanying text.

Although TIL does not *exempt* insurance transactions from its coverage, 15 U.S.C. § 1603,[11] we cannot twist this omission into an affirmative provision that "specifically relates" TIL to the business of insurance. Similarly, Congress' consideration of at least some aspects of the insurance business in the passage of TIL[12] is insufficient. An express application of a federal statute to the insurance business is required before TIL would automatically defeat a McCarran Act defense. We thus agree with the district court and others that TIL does not "specifically relate" to such business. *Cochran v. Paco, Inc., supra*, 409 F.Supp. at 224; *Ben v. General Motors Acceptance Corp.*, 374 F.Supp. 1199, 1201 (D.Colo.1974); *Gerlach v. Allstate Ins. Co., supra*, 338 F.Supp. at 649; *In re Providence Washington Ins. Co.*, 89 F.T.C. 345, 354 (1976); *Krischer, supra*, 30 Bus.Lawyer at 975.

---

**10.** 15 U.S.C. § 1014 provides:

Nothing contained in this chapter shall be construed to affect in any manner the application to the business of insurance of the Act of July 5, 1935, as amended, known as the National Labor Relations Act, or the Act of June 25, 1938, as amended, known as the Fair Labor Standards Act of 1938, or the Act of June 5, 1920, known as the Merchant Marine Act, 1920.

**11.** 15 U.S.C. § 1603 provides:

This subchapter does not apply to the following:

(1) Credit transactions involving extensions of credit for business or commercial purposes, or to government or governmental agencies or instrumentalities, or to organizations.

(2) Transactions in securities or commodities accounts by a broker-dealer registered with the Securities and Exchange Commission.

(3) Credit transactions, other than real property transactions, in which the total amount to be financed exceeds $25,000.

(4) Transactions under public utility tariffs, if the Board determines that a State regulatory body regulates the charges for the public utility services involved, the charges for delayed payment, and any discount allowed for early payment.

(5) Credit transactions primarily for agricultural purposes in which the total amount to be financed exceeds $25,000.

**12.** For example, 15 U.S.C. § 1605(a) defines "finance charge" as "the sum of all charges" imposed directly or indirectly "as an incident to the extension of credit, including any of the following types of charges which are applicable: * * * (5) Premium or other charge for any guarantee or insurance protecting the creditor against the obligor's default or other credit loss."

## B. "Business of Insurance"

Having concluded that TIL does not "specifically relate" to the business of insurance, we must now determine whether the district court properly concluded that Paco's premium financing in connection with Cochran's purchase of an automobile insurance policy from Cotton States constitutes the "business of insurance." The McCarran Act itself contains no definition of the "business of insurance," and the courts have not yet established the precise metes and bounds of the term. The Supreme Court provided some guidance in *Securities and Exchange Commission v. National Securities, Inc., supra*, in which Justice Marshall wrote:

> The statute did not purport to make the States supreme in regulating all the activities of insurance *companies*; its language refers not to the persons or companies who are subject to state regulation, but to laws "regulating the *business* of insurance." Insurance companies may do many things which are subject to paramount federal regulation; only when they are engaged in the "business of insurance" does the statute apply. Certainly the fixing of rates is part of this business; that is what *South-Eastern Underwriters* was all about. The selling and advertising of policies, *FTC v. National Casualty Co.*, 357 U.S. 560, 78 S.Ct. 1260, 2 L.Ed.2d 1540 (1958), and the licensing of companies and their agents, cf. *Robertson v. People of State of California*, 328 U.S. 440, 66 S.Ct. 1160, 90 L.Ed. 1366 (1946), are also within the scope of the statute.

Congress was concerned with the type of state regulation that centers around the contract of insurance, the transaction which *Paul v. Virginia* held was not "commerce." The relationship between insurer and insured, the type of policy which could be issued, its reliability, interpretation, and enforcement—these were the core of the "business of insurance." Undoubtedly, other activities of insurance companies relate so closely to their status as reliable insurers that they too must be placed in the same class. But whatever the exact scope of the statutory term, it is clear where the focus was—it was on the relationship between the insurance company and the policyholder. Statutes aimed at protecting or regulating this relationship, directly or indirectly are laws regulating the "business of insurance."

393 U.S. at 459–60, 89 S.Ct. at 568–69.

In applying *National Securities*, we must keep in mind that Paco is not an insurance company.[13] In premium financing agreements such as the one between Paco and Cochran, Paco advances the premiums to the insurance company and Cochran, the insured, pays Paco in periodic installments. In case of default, Paco can exercise its power of attorney and cancel the policy. In this limited sense, Paco steps into the shoes of the insured and gives notice of cancellation to the insurance company and the insured, and upon such cancellation, both the insurance company and the premium finance company must credit unearned premiums to the insured. *See* Ga.Code Ann.

---

**13.** At the outset we reject Paco's argument that under *National Securities* the McCarran Act exemption extends to people who are neither the insurance company nor the insured. Paco points to the following language in the *National Securities* case:

> The [McCarran Act] did not purport to make the States supreme in regulating all the activities of insurance *companies*; its language refers not to the persons or companies who are subject to state regulation, but to laws "regulating the *business* of insurance."

393 U.S. at 459, 89 S.Ct. at 568 (emphasis original). The Seventh Circuit accepted this contention in *Lowe v. Aarco-American, Inc., supra*, but we reject it, finding the analysis of the administrative law judge in *In re Providence Washington Ins. Co., supra*, more persuasive. There the judge said:

> [T]he language relied on by respondents did not purport to expand the "business of insurance" concept beyond the activities of insurance companies, but limited that concept to recognize that not all activities of insurance companies constitute the "business of insurance."

89 F.T.C. at 358. The full text of the Supreme Court's analysis in *National Securities*, set out above, makes this obvious. It is noteworthy that the Court in the same paragraph mentioned "insurer" or "insurance company" in five subsequent sentences.

§§ 84–5312, 84–5313. Thus, as the district court acknowledged, Paco is performing the same role in the "insurance business" as do other financing companies in the consumer sales business. 409 F.Supp. at 221. *See generally* Comment, *Insurance Premium Financing*, 19 Buff.L.Rev. 656 (1970).

Beyond the *National Securities* case, there is precious little judicial authority to aid us. The only appellate decision touching the issue is *Lowe v. Aarco-American, Inc., supra.* Relying on *National Securities* and *Gerlach v. Allstate Ins. Co., supra,* the court held that the credit sale of insurance policies by an insurance broker and a premium finance company was part of the business of insurance and that the transaction was thus outside the purview of TIL. The court also held that since the relevant activities were regulated extensively by the Illinois Insurance Code and the state's Premium Financing Companies Act, application of TIL would supersede Illinois law. Interestingly, there was no inconsistency between the disclosure provisions of TIL and the applicable Illinois requirements. 536 F.2d at 1162.

In *Gerlach* the plaintiff had purchased an Allstate automobile insurance policy on terms—10% down, balance in 10 installments with a flat 50¢ service fee per installment. Premium financing was not involved, since the plaintiff was not contractually obligated to pay the premiums; the single consequence of default was cancellation of the policy. The court held that Allstate's activities with respect to its premium payment plan and service charge were part of its rate structure and thus subject to regulation by the state of Florida. However, in rather sweeping dictum the court also stated that a premium financing arrangement would also have constituted the business of insurance and would have thus precluded application of TIL. 338 F.Supp. at 650. The *Lowe* court relied on this dictum.

We decline to follow these decisions, which contain no reasoned discussion of the *National Securities* standard and which, in our view, misconstrue the test. Under *National Securities*, the key factor is the relationship between the insurer and the insured, and statutes "aimed at protecting or regulating this relationship, directly or indirectly are laws regulating the 'business of insurance.' " 393 U.S. at 460, 89 S.Ct. at 568–69. In explaining that relationship, the Court focused on "the type of policy which could be issued, [and] its reliability, interpretation, and enforcement." *Id.* at 459, 89 S.Ct. at 568.

We fail to see how these elements in the insurer-insured relationship are affected to any significant extent by premium financing arrangements. Premium financing has little—if any—effect on an insurance company's ability to pay claims or on the nature of the policies it issues. Further, the activity could affect a policy's enforceability only in terms of whether the policy was in effect at a particular time, a question that might arise in the event of a payment error. Such a dispute, however, does not concern the details of the policy, its terms, or its coverage. We thus agree with the administrative law judge in *In re Providence Washington Ins. Co., supra,* a case in which a premium finance company—a wholly owned subsidiary of an insurance company—unsuccessfully defended charges of TIL violations on the basis of the McCarran Act. The administrative law judge said:

[T]he credit transactions here involved do not pertain to the particular details of the policy being purchased. The policy is purchased from [the insurance company], or such other insurance company as may be involved. The credit, as extended by [the premium finance company] to the insured, does not purport to involve the insurer regarding any of the policy's details. The policy is a self-contained document quite apart from the credit arrangement.

    \*     \*     \*     \*     \*     \*

[The premium finance company] is not an insurance company. It is in the business of extending consumer credit, and, in the course of that business, it collects outstanding obligations to it. It is not engaged in the business of insurance simply

because its loans are limited for the purpose of financing insurance premiums. It is no more in the business of insurance than a company which lends money for a number of purposes, including the financing of insurance premiums.

89 F.T.C. at 355-56.

In short, Paco cannot be said to be in the "business of insurance" simply because an insurance policy is tangentially involved. Although the borrower may appoint the premium finance company as his attorney to cancel the insurance in the event of default by the borrower, this does not make the lender-borrower relationship a part of the relationship between the insurer and the insured. Nor does the fact that the premium finance company takes a security interest affect the insurer-insured relationship. Paco's relationship to the business of insurance is much like that of an "ordinary" commercial lender to the business that receives the funds obtained by the borrower. When a bank repossesses and sells a car in which it has a secured interest to collect on a defaulted loan, it would be ludicrous to assert that the bank is in the automobile business. Similarly, a savings and loan association that lends money to the purchaser of a home is not in the business of selling real estate merely because it can exercise certain rights with respect to the property in the event of default. The lender's connection with the businesses involved in each of these situations is simply too tenuous, and similarly, premium financing has only a peripheral connection with the business of insurance.

■ Furthermore, even if we agreed with the district court that premium financing has a "considerable impact on the cost of the insurance," 409 F.Supp. at 223, that impact is insufficient to sustain a McCarran Act defense. "An activity is not a part of the business of insurance solely because it has an impact, favorable or otherwise, upon premiums charged by the insurer." *Royal Drug Co. v. Group Life & Health Ins. Co.*, 556 F.2d 1375, 1386 (5 Cir. 1977).

■ Accordingly, we hold that premium financing by an independent premium finance company does not constitute the "business of insurance" for purposes of the McCarran Act.[14] Therefore, the McCarran Act does not preclude the application of TIL's disclosure requirements to the transactions in the cases before us. The McCarran Act is to be "narrowly construed in the face of valid federal regulatory interests," *Securities and Exchange Comm'n v. Republic Nat'l Life Ins. Co.*, 378 F.Supp. 430, 436 (S.D.N.Y.1974), and it is obvious that TIL reflects such interests.[15]

The judgments in both *Cochran* and *Jones* are thus reversed and the cases remanded to the district court for further proceedings consistent with this opinion.

REVERSED and REMANDED.

BROWN, Chief Judge, concurs in the result.

---

14. At least one commentator has reached this conclusion. Krischer, *supra*, 30 Bus.Lawyer at 976. *See also* Comment, *Federal Regulation of Insurance Companies; The Disappearing McCarran Act Exemption*, 1973 Duke L.J. 1340, 1347–48 (exemption applies only when insurance company is engaged in an activity falling within Supreme Court's "restrictive definition" of the business of insurance).

15. Because of our holding that Paco's premium financing activities do not constitute the "business of insurance," our inquiry proceeds no further, and we need not consider whether Georgia has "enacted any law . . . for purposes of regulating" such activities or whether TIL would "invalidate, impair, or supersede" such state law.